UNITED MINE WORKERS OF AMERICA HEALTH &
RETIREMENT FUNDS ET AL. *v.* ROBINSON ET AL.

No. 81–61.  Argued January 13, 1982—Decided March 8, 1982

Stevens, J., delivered the opinion for a unanimous Court.

*E. Calvin Golumbic* argued the cause for petitioners. With him on the briefs was *William F. Hanrahan*.

*Larry F. Sword* argued the cause for respondents. With him on the brief was *John M. Rosenberg*.*

JUSTICE STEVENS delivered the opinion of the Court.

This case involves a discrimination between two classes of widows of coal miners who died prior to December 6, 1974—those whose husbands were receiving pensions when they died and those whose husbands were still working although they were eligible for pensions. The 1974 collective-bargaining agreement between the United Mine Workers of America and the Bituminous Coal Operators' Association, Inc., increased the health benefits for widows in the former class but

---

*Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll*, *Laurence Gold*, *Julia Penny Clark*, and *George Kaufmann* for the AFL–CIO; and by *Charles P. O'Connor* and *James H. Lengel* for the Bituminous Coal Operators' Association, Inc.

*Gill Deford*, *Neal S. Dudovitz*, and *Bruce K. Miller* filed a brief for the National Black Lung Association as *amicus curiae* urging affirmance.

made no increase for those in the latter class. The United States Court of Appeals for the District of Columbia Circuit held that this discrimination was arbitrary and therefore violated § 302(c)(5) of the Labor Management Relations Act of 1947 (LMRA).[1]  205 U. S. App. D. C. 330, 640 F. 2d 416 (1981).  We granted certiorari to decide whether § 302(c)(5) authorizes federal courts to review for reasonableness the provisions of a collective-bargaining agreement allocating health benefits among potential beneficiaries of an employee benefit trust fund.  454 U. S. 814.

## I

A description of the origin of the discrimination may explain why the Court of Appeals considered it arbitrary.  The

---

[1] That section provides in relevant part: ·

"The provisions of this section [forbidding transfers between employer and representatives of employees] shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon . . . ; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pension or annuities . . . ."  61 Stat. 157, as amended, 29 U. S. C. § 186(c) (1976 ed., Supp. IV).

1950 collective-bargaining agreement between the union and the operators established a fund to provide pension, health, and other benefits for certain miners and their dependents. That agreement defined the operators' obligation to contribute to the fund but delegated the authority to define the amount of benefits and the conditions of eligibility to the trustees of the fund.[2]   In 1967 the trustees adopted two resolutions governing benefits for widows.   Under the first, a widow of a retired miner who was receiving a pension at the time of his death was entitled to a death benefit of $2,000 payable over a 2-year period, and a widow of a miner who was eligible for a pension but who was still working at the time of his death was entitled to a $5,000 benefit payable over a 5-year period.[3]   The second resolution authorized hospital and medical-care benefits for unremarried widows of deceased miners while they were receiving the widows' benefit

---

[2] The National Bituminous Coal Wage Agreement of 1950, in creating the United Mine Workers of America Welfare and Retirement Fund of 1950, provided in part:

"Subject to the stated purposes of this Fund, the Trustees shall have full authority, within the terms and provisions of the 'Labor-Management Relations Act, 1947,' and other applicable law, with respect to questions of coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for provisions for benefits, investment of trust funds, and all other related matters."   App. to Pet. for Cert. 78a.

[3] Resolution No. 68, adopted on January 19, 1967, established "a Widows and Survivors Benefit of five thousand dollars ($5,000.00) as a result of the death of miners who at the time of death were regularly employed in a classified job in the bituminous coal industry by coal operators signatory to the National Bituminous Coal Wage Agreement of 1950, as amended, other than those exempted from said Agreement, and two thousand dollars ($2,000.00) in the event of the death of miners who at the time of death were receiving Trust Fund pensions and not employed outside the coal industry. . . ."   App. to Pet. for Cert. 82a.   The $5,000 benefit was payable in 60 monthly installments and the $2,000 benefit was payable in 22 monthly installments.   Id., at 85a.

authorized by the first resolution.[4] The effect of these two resolutions was to provide a greater health benefit for widows of working miners who were eligible for pensions than for widows of miners who were receiving pension benefits.

In 1974, because of their concerns about compliance with minimum funding standards of the recently enacted Employee Retirement Income Security Act (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.* (1976 ed. and Supp. IV), and about the actuarial soundness of the 1950 fund, the union and the operators agreed to restructure the industry's benefit program. They agreed that the amount of benefits and the eligibility requirements, as well as the level of contributions, should be specified in their collective-bargaining agreement. They also decided to replace the single 1950 fund with four separate funds, two of which provided pension benefits while two others, the "1950 Benefit Trust" and the "1974 Benefit Trust," provided health and death benefits. The 1950 Benefit Trust, which is at issue in this case, extended lifetime health coverage to certain widows of miners who died before December 6, 1974, the effective date of the 1974 collective-bargaining agreement.[5]

---

[4] Resolution No. 69, also adopted on January 19, 1967, provided in part: "The following persons shall be eligible for benefits herein provided for hospital and medical care . . . : .

"5. Unremarried widows and unmarried dependent children under twenty-two (22) years of age of deceased miners described in Subparagraph B of this Paragraph I as long as they are the recipients of Widows and Survivors Benefits provided in Paragraph II of Resolution No. 68." App. to Pet. for Cert. 90a.

[5] Article II, E(3), of the 1950 Benefit Trust provides that lifetime health benefits shall be provided to the survivors "of a miner who died . . . [p]rior to the effective date of this Plan . . . at a time when he was receiving a retirement or disability pension under the eligibility rules then in effect of the United Mine Workers of America Welfare and Retirement Fund of 1950." App. to Pet. for Cert. 114a. "By the trustee's interpretation, this clause applies to survivors of miners who died while collecting pensions and, as well, to survivors of those who, though not actually receiving re-

During the 1974 negotiations, the union originally demanded that all unremarried widows who were entitled to health benefits for either two years or five years under the old plan be extended lifetime health coverage. Both the amount and the uncertainty of the cost of such coverage for these widows concerned the operators. Relatively early in the negotiations they nevertheless accepted the demand as it related to widows of miners who would die after the agreement became effective, but they objected to the requested increase for widows of already deceased miners. The operators estimated that the latter class consisted of between 25,000 and 50,000 widows, whereas the union's estimate was approximately 40,000. Of that total, about 10% were believed to be widows of miners who had been working at the time of their death, even though eligible for pensions, and thus already had been entitled to five years of health benefits. In the final stages of the 1974 negotiations, after a strike had begun, the operators made a package proposal to the union that excluded this smaller group of perhaps 4,000 or 5,000 widows from any increased health benefits. Besides making it possible to conclude an otherwise acceptable, complex collective-bargaining agreement and to avoid a prolonged strike, the union received no separately identifiable *quid pro quo* for the rejection of this portion of its demands.

## II

Respondents are widows of coal miners who died in 1967 and 1971, respectively. Their husbands were over age 55, had been employed in the industry for over 20 years, and had spent most of their careers in the employ of contributing em-

---

tirement payments at death, had ceased work and applied for them. This construction, however, excludes widows and dependents of those miners who were eligible for pensions but who continued working and later died before applying for health-care benefits." 205 U. S. App. D. C. 330, 333, 640 F. 2d 416, 419 (1981) (footnotes omitted).

ployers. They were eligible for pensions but were still working at the time of their deaths. Under the 1950 plan, respondents were entitled to $5,000 death benefits and health benefits for five years. They received no additional benefits from the 1974 agreement. Had their husbands applied for the pensions for which they were eligible, they now would be entitled to lifetime health coverage.

On their own behalf and as representatives of a class of similarly situated widows and dependents of deceased coal miners, respondents brought this action against the trustees of the funds in the United States District Court for the District of Columbia.[6] They alleged that the requirement that a miner actually be receiving a pension for which he was eligible at the time of his death in order to make his survivors eligible for lifetime health benefits has no rational relationship with the purposes of the trust funds and therefore was illegal under § 302 of the LMRA. They prayed that the requirement be declared null and void and that the trustees be ordered to pay to them health benefits retrospectively and prospectively.

After certifying the respondents' class,[7] and after indicating that the plaintiffs had made a prima facie showing of arbitrariness, the court scheduled a hearing to give the petitioners an opportunity to prove that the discrimination against respondents was not arbitrary. At that hearing the District Court received documents prepared during the 1974 collec-

---

[6] Federal district courts have jurisdiction to restrain violations of § 302. 29 U. S. C. § 186(e).

[7] "The class represents all surviving spouses and dependents of deceased miners who satisfied the age and service requirements for pension benefits at the time of death and who

"(1) were working in classified service in the coal industry at the time of death and had not applied for a pension, or

"(2) had applied for and were eligible to receive pension benefits but were not receiving such benefits at the time of death because of their return to classified service in the coal industry." 449 F. Supp. 941, 942 (1978).

tive-bargaining negotiations and heard the testimony of participants in those negotiations. Based on that evidence, the District Court found that "the question of whether or not to provide plaintiffs the benefits they now seek was the subject of explicit, informed and intense bargaining." App. to Pet. for Cert. 25a. The court rejected the argument that the eligibility requirement was arbitrary and capricious and held that "the trustees are bound to adhere to the terms of the agreement." *Ibid.* The court concluded:

> "Public policy dictates the limited role of courts in reviewing collectively bargained agreements. The familiar history of the anguished relations between the bargaining parties in this case only underscores the delicacy of the balance set in each agreement. Plaintiffs' relief, if indeed any is due, cannot come from the courts." *Ibid.*

A divided panel of the Court of Appeals reversed. Relying on the § 302(c)(5) requirement that jointly administered pension trusts be maintained "for the sole and exclusive benefit of the employees of [the contributing] employer, and their families and dependents," the court held that any rule denying benefits to employees on whose behalf significant contributions had been made must be explained to its satisfaction, particularly if benefits were authorized for others who had worked a lesser period of time for contributing employers. 205 U. S. App. D. C., at 335, 640 F. 2d, at 421. In this case, the trustees were unable to produce an acceptable explanation for the discrimination between widows of pensioners and widows of pension-eligible miners. Specifically, the court held that it was "not enough that the particular eligibility standards were adopted simply because that enabled resolution of a collective bargaining dispute." *Id.*, at 338, 640 F. 2d, at 424. Recognizing the legitimacy of a concern about actuarial soundness of pension trust funds, the court held that "financial integrity must be secured by methods dividing beneficiaries from nonbeneficiaries on lines reasonably

calculated to further the fund's purposes." *Id.*, at 337–338, 640 F. 2d, at 423–424.

Judge Robb, in dissent, agreed with the reasoning of the District Court and added the observation that the discrimination against widows of active miners was rational because those widows had received a larger death benefit than widows of pensioners, and because their needs may have been lesser than those of the families of pensioners since their husbands had continued to work after they were eligible for pensions.

### III

The Court of Appeals held that the requirement in § 302(c)(5) that an employee benefit trust fund be maintained "for the sole and exclusive benefit of the employees . . . and their families and dependents" means that eligibility rules fixed by a collective-bargaining agreement must meet a reasonableness standard. The statutory language hardly embodies this reasonableness requirement. Its plain meaning is simply that employer contributions to employee benefit trust funds must accrue to the benefit of employees and their families and dependents, to the exclusion of all others. Indeed, this has been this Court's consistent interpretation of § 302(c)(5).

Just last Term, the Court reiterated that "the 'sole purpose' of § 302(c)(5) is to ensure that employee benefit trust funds 'are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them . . . .'" *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 331 (quoting 93 Cong. Rec. 4678 (1947), reprinted in 2 Legislative History of the Labor Management Relations Act, 1947, p. 1305 (Leg. Hist. LMRA)). See *Arroyo* v. *United States*, 359 U. S. 419, 425–426.[8] Accord, *Walsh* v. *Schlecht*,

---

[8] The Court in *Arroyo* stated:

"Those members of Congress who supported [§ 302] were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with

429 U. S. 401, 410–411; *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459, 474 (Frankfurter, J., dissenting). This reading is amply supported by the legislative history. See, *e. g.*, 93 Cong. Rec. 4877 (1947), 2 Leg. Hist. LMRA, at 1312;[9] 93 Cong. Rec., at 4752–4753, 2 Leg. Hist. LMRA, at 1321–1322.[10] The section was meant to protect employees

---

the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. Congressional attention was focussed particularly upon the latter problem because of the demands which had then recently been made by a large international union for the establishment of a welfare fund to be financed by employers' contributions and administered exclusively by union officials. See *United States* v. *Ryan*, 350 U. S. 299.

"Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. See 92 Cong. Rec. 4892–4894, 4899, 5181, 5345–5346; S. Rep. No. 105, 80th Cong., 1st Sess., at 52; 93 Cong. Rec. 4678, 4746–4747. To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established. See Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv. L. Rev. 274, 290" (footnotes omitted).

[9] Senator Taft, the primary author of the LMRA, stated:

"Certainly unless we impose some restrictions we shall find that the welfare fund will become merely a war chest for the particular union, and that the employees for whose benefit it is supposed to be established, for certain definite welfare purposes, will have no legal rights and will not receive the kind of benefits to which they are entitled after such deductions from their wages."

[10] Senator Ball, one of the sponsors of the floor amendment that became § 302, stated:

"All that is sought to be done by the amendment is to protect the rights of employees. After all, on any reasonable basis, payments by an employer to such a fund are in effect compensation to his employees. All that is sought to be done in the amendment is to see to it that the rights of employees in the fund are protected. . . .

.          .          .          .          .

"In other words, when the union has complete control of this fund, when there is no detailed provision in the agreement creating the fund respecting

from the risk that funds contributed by their employers for the benefit of the employees and their families might be diverted to other union purposes or even to the private benefit of faithless union leaders. Proponents of this section were concerned that pension funds administered entirely by union leadership might serve as "war chests" to support union programs or political factions, or might become vehicles through which "racketeers" accepted bribes or extorted money from employers.

Our interpretation of the purpose of the "sole and exclusive benefit" requirement is reinforced by the other requirements of § 302(c)(5). Section 302(c)(5) is an exception in a criminal statute that broadly prohibits employers from making direct or indirect payments to unions or union officials. Each of the specific conditions that must be satisfied to exempt employer contributions to pension funds from the criminal sanction is consistent with the nondiversion purpose. The fund must be established "for the sole and exclusive benefit" of employees and their families and dependents; contributions must be held in trust for that purpose and must be used exclusively for health, retirement, death, disability, or unemployment benefits; the basis for paying benefits must be specified in a written agreement; and the fund must be jointly administered by representatives of management and labor.[11] All the conditions in the section fortify the basic requirement that employer contributions be administered for the sole and exclusive benefit of employees. None of the conditions places any restriction on the allocation of the funds among the persons protected by § 302(c)(5).

---

the benefits which are to go to employees, the union and its leadership will always come first in the administration of the fund, and the benefits to which the employees supposedly are entitled will come second."

[11] See *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 328–329; H. R. Rep. No. 510, 80th Cong., 1st Sess., 66–67 (1947), 1 Leg. Hist. LMRA, at 570–571.

The Court of Appeals did not attempt to ground its holding on the text or legislative history of § 302(c)(5). Rather, the court relied upon cases in which trustees of employee benefit trust funds, not the collective-bargaining agreement, fixed the eligibility rules and benefit levels. The Court of Appeals has held in those cases "that the Trustees have 'full authority . . . with respect to questions of coverage and eligibility' and that the court's role is limited to ascertaining whether the Trustees' broad discretion has been abused by the adoption of arbitrary or capricious standards." *Pete* v. *United Mine Workers of America Welfare & Retirement Fund of 1950*, 171 U. S. App. D. C. 1, 9, 517 F. 2d 1275, 1283 (1975) (en banc) (footnote omitted). Noting that "[t]he institutional arrangements creating this Fund and specifying the purposes to which it is to be devoted are cast expressly in fiduciary form," the court stated that "the Trustees, like all fiduciaries, are subject to judicial correction in a proper case upon a showing that they have acted arbitrarily or capriciously towards one of the persons to whom their trust obligations run." *Kosty* v. *Lewis*, 115 U. S. App. D. C. 343, 346, 319 F. 2d 744, 747 (1963), cert. denied, 375 U. S. 964. Those cases, however, provide no support for the Court of Appeals' holding in this case.[12] The petitioner trustees were not given "full authority" to determine eligibility requirements and benefit levels, for these were fixed by the 1974 collective-bargaining agreement. By the terms of the trust created by that agreement, the trustees are obligated to enforce these

---

[12] In *NLRB* v. *Amax Coal Co.*, *supra*, at 330, the Court held that in enacting § 302(c)(5) "Congress intended to impose on trustees traditional fiduciary duties." The Court did not decide, nor do we decide today, whether federal courts sitting as courts of equity are authorized to enforce those duties. It is, of course, clear that compliance with the specific standards of § 302(c)(5) in the administration of welfare funds is enforceable in federal district courts under § 302(e) of the LMRA. See *Arroyo* v. *United States*, 359 U. S. 419, 426–427.

determinations unless modification is required to comply with applicable federal law.[13]  The common law of trusts does not alter this obligation.   See *NLRB* v. *Amax Coal Co.*, 453 U. S., at 336–337; Restatement (Second) of Trusts § 164 (1959).   Cf. 29 U. S. C. § 1104(a)(1)(D) (1976 ed., Supp. IV). Absent conflict with federal law, then, the trustees breached no fiduciary duties in administering the 1950 Benefit Trust in accordance with the terms established in the 1974 collective-bargaining agreement.

Section 302(c)(5) plainly does not impose the Court of Appeals' reasonableness requirement, and respondents do not offer any alternative federal law to sustain the court's holding.   There is no general requirement that the complex schedule of the various employee benefits must withstand judicial review under an undefined standard of reasonableness. This is no less true when the potential beneficiaries subject to discriminatory treatment are not members of the bargaining unit; we previously have recognized that former members and their families may suffer from discrimination in collective-bargaining agreements because the union need not "affirmatively . . . represent [them] or . . . take into account their interests in making bona fide economic decisions in be-

[13] "The Trustees are authorized, upon approval by the Employers and the Union, to make such changes in the Plans and Trusts hereunder as they may deem to be necessary or appropriate.

"They are also authorized and directed, after adquate notice and consultation with the Employers and Union, to make such changes in the Plans and Trusts hereunder, including any retroactive modifications or amendments, which shall be necessary:

"(a) to conform the terms of each Plan and Trust to the requirements of ERISA, or any other applicable federal law, and the regulations issued thereunder;

. .      .      .       .       .

"(d) to comply with all applicable court or government decisions or ruling."   National Bituminous Coal Wage Agreement of 1974, art. XX, § (h)(5), App. to Pet. for Cert. 106a.

half of those whom it does represent." *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 181, n. 20.[14] Moreover, because finite contributions must be allocated among potential beneficiaries, inevitably financial and actuarial considerations sometimes will provide the only justification for an eligibility condition that discriminates between different classes of potential applicants for benefits. As long as such conditions do not violate federal law or policy, they are entitled to the same respect as any other provision in a collective-bargaining agreement.

The substantive terms of jointly administered employee benefit plans must comply with the detailed and comprehensive standards of the ERISA. The terms of any collective-bargaining agreement must comply with federal laws that prohibit discrimination on grounds of race, color, religion, sex, or national origin;[15] that protect veterans;[16] that regulate certain industries;[17] and that preserve our competitive economy.[18] Obviously, an agreement must also be substantively consistent with the National Labor Relations Act, 29 U. S. C. § 151 *et seq.*[19] Moreover, in the collective-bargain-

---

[14] We also recognized that these persons are not without protection: "Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. See generally Note, 70 Col. L. Rev. 909, 916–920 (1970). The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed. See *Smith* v. *Evening News Assn.*, 371 U. S. 195, 200–201 (1962); *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459, 470 (1960)." 404 U. S., at 181, n. 20.

[15] See, *e. g.*, *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (Title VII of the Civil Rights Act of 1964); *Corning Glass Works* v. *Brennan*, 417 U. S. 188 (Equal Pay Act).

[16] See, *e. g.*, *Fishgold* v. *Sullivan Dry Dock & Repair Corp.*, 328 U. S. 275, 285.

[17] See, *e. g.*, *Norfolk & Western R. Co.* v. *Nemitz*, 404 U. S. 37.

[18] See, *e. g.*, *Mine Workers* v. *Pennington*, 381 U. S. 657.

[19] See, *e. g.*, *NLRB* v. *Magnavox Co.*, 415 U. S. 322; *Radio Officers* v. *NLRB*, 347 U. S. 17.

ing process, the union must fairly represent the interests of all employees in the unit.[20] But when neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract.[21]

The record in this case discloses no violation of § 302(c)(5) or of any other federal law. The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*

---

[20] See, *e. g., Vaca* v. *Sipes*, 386 U. S. 171, 177; *Syres* v. *Oil Workers*, 350 U. S. 892; *Ford Motor Co.* v. *Huffman*, 345 U. S. 330; *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192. See also *Railroad Trainmen* v. *Howard*, 343 U. S. 768.

[21] See, *e. g., Carbon Fuel Co.* v. *Mine Workers*, 444 U. S. 212, 218–219; *H. K. Porter Co.* v. *NLRB*, 397 U. S. 99, 105–108; *NLRB* v. *Insurance Agents*, 361 U. S. 477, 488; *Teamsters* v. *Oliver*, 358 U. S. 283, 295–296; *NLRB* v. *American National Ins. Co.*, 343 U. S. 395, 404.