750 F.2d 1458
 6 Employee Benefits Ca 1193
 Edward SHAW, individually and on behalf of all other persons
similarly situated, Plaintiff/Appellee, Cross-Appellant,
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS PENSION PLAN; and Eugene Glover, William
Winpinsinger and George Poulin as fiduciaries and trustees
of the International Association of Machinists and Aerospace
Workers Pension Plan, Defendants/Appellants, Cross-Appellee.
 Nos. 83-6443, 83-6458.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 6, 1984.
Decided Jan. 11, 1985.
 
 Ronald Dean, Pacific Palisades, Cal., for plaintiff, appellee, cross-appellant.
 Richard P. Donaldson, Donaldson & Roberts, San Diego, Cal., for defendants, appellants, cross-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before SNEED, ANDERSON and FERGUSON, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 The International Association of Machinists and Aerospace Workers Pension Plan ("IAM") appeals from the district court's denial of its motion for summary judgment and its granting of plaintiff Shaw's motion for summary judgment. The IAM in this case is in the posture of employer; its pension plan benefited retired IAM officers, organizers and support staff. The IAM plan contained a "living pension" feature that tied the amount of payments to pensioners to the current salary of the job from which the pensioner retired. Thus, as salaries for positions rose, pensions to retirees who formerly held those positions also rose.
 
 
 2
 Due to the increasing financial strain that this "living pension" feature placed on the fiscal soundness of the plan, the IAM adopted an amendment to the plan that phased out the living pension feature over several years. ERISA, however, provides: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than amendment described in section 1082(c)(8) of this title." 29 U.S.C. Sec. 1054(g). The amendment in this case was not one "described in section 1082(c)(8)."
 
 
 3
 If the limitation on amendments contained in Sec. 1054(g) was effective against the IAM, a labor union, on the date the amendment was adopted, it might render that amendment illegal. One question, therefore, is whether the amendment reduces an "accrued benefit," or simply an ancillary benefit. The other question is whether the limitation on amendments quoted above was effective against the IAM on the date that the IAM plan adopted that amendment.
 
 
 4
 Shaw also contends that the district court erred in declining to award prejudgment interest. That decision, however, lies within the district court's discretion and its careful balancing of the equities. The court correctly weighed the financial strain that prejudgment interest would place on the IAM along with other factors, and correctly declined to enhance Shaw's award.
 
 FACTS
 
 5
 The current IAM Pension Plan is an "employee benefit pension plan" as that term is defined in ERISA Sec. 3(2), 29 U.S.C. Sec. 1002(2). It was created in 1980 as the result of a merger of three previously maintained staff pension plans.
 
 
 6
 The terms of the merged plan are contained in the IAM Constitution and the IAM Pension Plan booklet. The unamended plan calculated monthly pension benefits by multiplying three numbers: 2.5%, times years of credited service, times final monthly salary. In Mr. Shaw's case the completed equation would be: (2.5%) X (10 years) X ($1,732.47 final salary) = $433.12. (Mr. Shaw chose a joint and survivor option, which lowered his monthly benefit to $209.19 but would continue benefits to his spouse upon his death; the calculation of his initial monthly benefit, upon which the joint and survivor option is based, remains the same, however.)
 
 
 7
 The unamended plan also contained a "living pension" feature that geared increases in the retiree's pension benefits to salary increases in the position the retiree held immediately prior to retirement. The plan accomplished this by substituting the current monthly salary for the retiree's final monthly salary in the above equation. The IAM constitution's own words describe it this way: "Pensions being paid to persons previously retired under this Art. shall be adjusted by applying the appropriate foregoing percentage to the salaries for positions corresponding to those in which they were employed immediately prior to their retirement." IAM Constitution, Art. XV, Sec. 7, Computation of Pension, p 2 (emphasis supplied). Thus, the constitution retains the same multiplier--2.5% times years of service--but changes the multiplicand and, by using the word "shall," makes this change mandatory.
 
 
 8
 The IAM's Pension Plan booklet explains this change in similarly mandatory and clear language: "If, after your retirement, the salary for the position you held immediately prior to your retirement is changed, the amount of your pension will be adjusted accordingly." P. 10. The booklet contains sample computations on page 26 in which the multiplicand is simply called "Monthly Pay," but whose monthly pay is not specified.
 
 
 9
 Shaw turned sixty-five in January, 1975. He retired from his job as business representative for District Lodge 710 of Torrance, California. The district court's opinion summarized succinctly the effect of the amendment upon the benefits to which Shaw was previously entitled:
 
 
 10
 In September, 1976, the delegates to a quadrennial IAM convention voted to amend the pension plan provisions of the constitution so as to phase out the living pension feature. This phase-out provided that the full percentage adjustment would be paid to retirees in 1977 and 1978, but thereafter, the living pension adjustments would be as follows:
 
 
 11
 1979 and 1980--75% of full adjustment
1981 and 1982--50% of full adjustment
1983 and 1984--25% of full adjustment.
 
 
 12
 Shaw v. International Association of Machinists and Aerospace Workers Pension Plan, 563 F.Supp. 653, 654 (C.D.Cal.1983).
 
 
 13
 This amendment decreases Shaw's benefits. However, the only amendments subject to ERISA's limitation on amendments--Sec. 1054(g)--are amendments that decrease "accrued benefits" and that were adopted after the effective date of the limitation. The IAM challenges the district court's decision that (1) the amendments occurred within ERISA's effective date; and (2) Shaw's pension benefits, including its living pension feature, were accrued, and thus could not be summarily decreased.
 
 STANDARD OF REVIEW
 
 14
 A grant of summary judgment is reviewed de novo. Lane v. Goren, 743 F.2d 1337, 1339 (9th Cir.1984). In this case, there are no relevant contested issues of fact with respect to summary judgment; thus, "the panel need only decide whether the substantive law was correctly applied." Id. Shaw's cross-appeal of the district court's denial of prejudgment interest is reviewed under the abuse of discretion standard. See Bricklayers' Pension Trust Fund v. Taiariol, 671 F.2d 988, 990 (6th Cir.1982).DISCUSSION
 
 I. The Act's Effective Date
 
 15
 Part 2 of ERISA contains participation and vesting requirements. In this part, 29 U.S.C. Sec. 1054(g) provides: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in [29 U.S.C. Sec. 1082(c)(8), contained in Part 3 of ERISA]." Part 2's mandates became effective "in the case of plan years beginning after September 2, 1974." 29 U.S.C. Sec. 1061(a). Therefore, the effective year would be 1975.
 
 
 16
 Part 3 of ERISA provides funding requirements. This part contains 29 U.S.C. Sec. 1082(c)(8) to which the Part 2's limitation on amendments refers. This section provides a description of the only permissible means of decreasing plan benefits by amendment. Such an amendment will be approved if: "the plan administrator files a notice with the Secretary notifying him of such amendment and the Secretary has approved ... or ... failed to disapprove such amendment." Part 3's effective dates vary. It becomes effective against pension plans for employees of tax-exempt labor organizations (under 26 U.S.C. Sec. 501(c)(5)), such as the IAM, on the earlier of:
 
 
 17
 (1) the date on which the second convention of such labor organization held after September 2, 1974, ends or
 
 
 18
 (2) December 31, 1980.
 
 
 19
 29 U.S.C. Sec. 1086(e). In this case, that date would be September 10, 1980, the date on which the IAM's second convention after September 2, 1974, ended.
 
 
 20
 The controverted amendment was adopted at IAM's 1976 convention--in between 1975 and 1980. If Part 3's effective date governs, the amendment could reduce accrued benefits with impunity; if Part 2's effective date governs, no amendment could reduce accrued benefits unless application was made to, and approved by (or not disapproved by), the Secretary.
 
 
 21
 The IAM argues that the later date governs. It reasons that Part 2's (Sec. 1054(g)'s) limitation on amendments, because it refers to a permissible amendment process described in Part 3 (Sec. 1082(c)(8)), must incorporate the latter's deferred effective date. This interpretation is illogical: it makes the first section, the broad prohibition on decreases, superfluous, and makes the second section, the exemption, become the rule. This interpretation also contradicts ERISA's purposes. Part 2's section, 1054(g), protects vesting by prohibiting decreases in accrued benefits in most circumstances. This general declaration comports with ERISA's general concern for protecting workers' vested interests. Part 3's section, 1082(c)(8), describes the procedure for procuring an exception to the general prohibition. It would flout the purpose of ERISA for us to expand the applicability of the exception by making it effective earlier than Congress did. It would also create an unprecedented six-year window--between 1974 and 1980--within which union plans could unilaterally decrease accrued benefits with impunity. General contract principles precluded such action before ERISA. See UMWA Health & Retirement Funds v. Robinson, 455 U.S. 562, 575 n. 14, 102 S.Ct. 1226, 1234 n. 14, 71 L.Ed.2d 419 (1982). As Shaw correctly points out, "It would be ironic indeed if ERISA were interpreted to casually dispense with even this modicum of protection."
 
 
 22
 The IAM plan also argues that Congress intended that ERISA be interpreted the plan's way. They contend, explicitly, that to achieve consistency between ERISA's Title I (Labor Code) and Title II (Tax Code) amendments, both titles' dates of effectiveness with respect to labor unions should be deferred equally. They also contend, implicitly, that to achieve consistency between ERISA's Labor Code provisions--Part 2, Participation and Vesting, and Part 3, Funding--both Parts' dates of effect with respect to labor unions should be identically extended.
 
 
 23
 Congress, however, seems to have been conscious of the fact that it adopted staggered and discrepant dates of effectiveness. In fact, a report called all these differences to the attention of House and Senate conferees. Staff of House and Senate Conferees on H.R. 2, 93d Cong., 2d Sess., Summary of Differences Between the Senate Version and the House Version of H.R. 2 to Provide for Pension Reform, Prepared for the Use of the House and Senate Conferees on H.R. 2, Part One, Participation, Vesting, Funding, Actuaries, Jurisdiction and Portability at 28 (Comm. Print, May 15, 1974) [hereinafter "Conferees' Report"], reprinted in III Subcommittee on Labor of the Committee on Labor and Public Welfare, United States Senate, Legislative History of the Employee Retirement Income Security Act of 1974, 5151 at 5181 [hereinafter "Legislative History"]. This Conferees' Report compared House and Senate versions of Title I's and Title II's effective dates for Part 2's vesting requirements, and referred specifically to the question of delayed applicability to labor unions, by referring to "Staff Comments" on pp. 10-11. Id. The Conferees' Report also compared House and Senate versions of Title I's and Title II's effective dates for Part 3's funding requirements, and noted specifically the potential discrepancy between effective dates for funding and vesting. Conferees' Report at 41, III Legislative History at 5181 and 5194-95. Indeed, the staff commented with respect to funding: "Some of the staff believe the effective dates for funding should be the same as for vesting, and others believe (if an early effective date is chosen for vesting) that the effective dates for funding should be later than for vesting." Conferees' Report at 42, III Legislative History at 5195 (parenthesis in original). And, referring to vesting and participation, the staff commented: "The conferees may wish in the case of plans maintained by tax-exempt labor organizations to apply new standards [at a later date]." Conferees' Report at 11, III Legislative History at 5164. Congress responded by adopting only a limited deferment of applicability to labor unions--for the Labor Code's funding requirements, but not its vesting requirements. Its seemingly discordant effective dates thus seem to reflect conscious choices.
 
 
 24
 Shaw argues that Sec. 1054(g)'s limitation on amendments is almost absolute, excepting only the cross-referenced procedure of applying to, and securing the approval of, the Secretary. Absent compliance with the cross-referenced procedure, Shaw argues, no amendments may decrease benefits. Despite the delayed applicability of this procedure to labor unions, the earlier applicability of the general, substantive prohibition governs. To rule otherwise would effectively repeal Sec. 1054(g)'s general, substantive mandate against decreasing accrued benefits, and leave available only Sec. 1082(c)(8)'s allowance of decreasing accrued benefits through later amendments.
 
 
 25
 The legislative history is illuminating on this point. The bills that were to become ERISA originally contained no distinction between the dates of effectiveness for vesting and funding provisions or with respect to labor unions and other plans. E.g., S. 4, 93d Cong., 1st Sess. Sec. 701 (1973), reprinted in I Legislative History at 189. Deferred applicability of participation and funding provisions to labor organizations began to appear later. See H.R.Rep. No. 93-779, 93d Cong., 2d Sess. 51, 100 (1974), reprinted in II Legislative History at 2640, 2689. The legislature was aware that discrepancies appeared in the effective dates for different Parts, but it tolerated later effective dates "in the case of plans in existence on January 1, 1974, in order to afford such plans adequate opportunity to adopt any amendments needed in order to conform to the new requirements resulting from this bill." Committee on Education and Labor, Employee Benefit Security Act of 1974: Material Explaining H.R. 12906 Together with Supplemental Views, reprinted in II Legislative History 3293 at 3334. The legislature even contemplated a means for resolving some seeming discrepancies:
 
 
 26
 Where a qualified plan does not meet the funding requirements of existing law because of vesting or participation requirements made applicable by the substitute and where the funding requirements of the conference substitute do not become applicable until a later time than the vesting or participation requirements, then to the extent that failure to meet the funding requirements of existing law is attributable to these new vesting or participation requirements, no plan is to be disqualified in this interim period on the grounds of underfunding.
 
 
 27
 H.R.Rep. No. 93-1280, 93d Cong., 2d Sess. 294 (1974), U.S.Code Cong. & Admin.News 1974, pp. 4639, 5074, reprinted in III Legislative History 4277 at 4561. We have the opposite problem here: not underfunding, but "undervesting"--failure to meet the vesting section's mandates. But the IAM's failure is not attributable to the potentially exculpatory effect of its striving to meet funding requirements. No funding requirement demanded contravention of the vesting requirement regarding diminution of accrued benefits. In the absence of such a conflicting, and thus potentially exculpatory, mandate, the vesting section's provisions are effective and absolute.
 
 
 28
 Congress chose to defer applicability of ERISA's funding provisions to labor unions, but not to deter ERISA's vesting provisions. ERISA's limitation on decreasing accrued benefits by amendment was thus effective in 1975, one year before the IAM adopted its take-away amendment.
 
 
 29
 II. The living pension feature is an "accrued benefit" within the meaning of ERISA and thus subject to ERISA's limitation on amendments decreasing accrued benefits.
 
 
 30
 ERISA provides: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 302(c)(8) [29 U.S.C. Sec. 1082(c)(8) ]." 29 U.S.C. Sec. 1054(g). Shaw and the IAM disagree over whether the living pension feature is an accrued benefit within the meaning of this section. If the feature were an accrued benefit, it would be subject to the limitations on decrease of benefits through plan amendment for which this section, and the cross-referenced section, provide; if the feature were not an accrued benefit, then it is subject to no such limitation.
 
 
 31
 The plain language of ERISA provides little help in determining whether the living pension feature is an accrued benefit or not:
 
 
 32
 The term "accrued benefit" means ... in the case of a defined benefit plan, the individuals's accrued benefit determined under the plan and, except as provided in section 1054(c)(3), expressed in the form of an annual benefit commencing at normal retirement age ....
 
 
 33
 29 U.S.C. Sec. 1002(23). Thus, ERISA's language provides only two sources for defining "accrued": (1) a tautological reference to the individual's accrued benefit; and (2) a somewhat more enlightening reference to the plan. Before turning to the plan itself, we turn to other sources of guidance.
 
 
 34
 ERISA's history provides a little more help. It, too, defers to the private employer's plan, "subject to certain requirements." H.R.Rep. No. 93-807, 93d Cong., 2d Sess. 60 (1974), reprinted in II Legislative History at 3180. It describes benefits that are considered accrued. This category includes pension or retirement benefits, and the types of benefits that are not generally transferable when employees move on to new jobs. It distinguishes these from ancillary benefits, such as medical or life insurance. Benefits in this latter category lack the "primary function ... [of] provid[ing] retirement income"; are generally provided by succeeding employers. Also, accrued benefits do not include
 
 
 35
 such items as the value of the right to receive benefits commencing at an age before normal retirement age, or so-called social security supplements which are commonly paid in the case of early retirement but then cease when the retiree attains the age at which he becomes entitled to receive current social security benefits, or any value in a plan's joint and survivor annuity provisions to the extent that exceeds the value of what the participant would be entitled to receive under a single life annuity.
 
 
 36
 Id., U.S.Code Cong. & Admin.News 1974, p. 4726.
 
 
 37
 The living pension feature fits more easily within the enumeration of accrued benefits. The feature is a "pension or retirement benefit[ ]"; it primarily provides retirement income; and it is not generally transferable from one employer to another. The living pension feature does not fit within any of the enumerated categories of ancillary or nonaccrued benefits. Aside from these categories, "the accrued benefit is to be determined under the plan." H.R.Rep. No. 93-1280, 93d Cong., 2d Sess. 273 (1974), U.S.Code Cong. & Admin.News 1974, p. 5054, reprinted in III Legislative History 4277 at 4540.
 
 
 38
 The case law also categorizes various benefits as either vested or ancillary. No case, however, deals with the narrow issue of post-retirement upward adjustments like the living pension provision. The categories defined by the case law parallel those enumerated in the legislative history. In Sutton v. Weirton Steel Division of National Steel Corp., 567 F.Supp. 1184 (W.Va.1983), aff'd 724 F.2d 406 (4th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), for example, the district court held:
 
 
 39
 An examination of the eligibility requirements for 70/80 and rule of 65 retirement reveals they are conditional and in the nature of early retirement benefits and cannot be considered nonforfeitable or as an accrued benefit.... Since the increased $400.00 per monthly pension is conditioned upon eligibility for 70/80 or rule of 65 retirement, it cannot be considered nonforfeitable.
 
 
 40
 Id. at 1196. The living pension feature, in contrast, is not "in the nature of early retirement benefits." Nor is it "conditional": the Constitution provides for the adjustment in mandatory language, to be measured by an occurrence wholly outside the pensioner's control. The Sutton court used the legislative history as a guide, but it made its determination based on the terms of the plan itself.
 
 
 41
 On appeal, the court added the term "unfunded" to describe the typical unaccrued, contingent early retirement benefit. 724 F.2d at 409. This bolstered further the district court's decision that the unfunded early retirement benefits at issue in that case were ancillary, rather than funded. The living pension feature in the IAM Plan, in contrast, was included with the rest of the pension funds when the Plan's liabilities were computed.
 
 
 42
 Similarly, in Petrella v. NL Industries, Inc., 529 F.Supp. 1357 (D.N.J.1982), the court recited the difference between ancillary and accrued benefits under ERISA and decided that the benefits before it were not accrued. Id. at 1366. This case squeezed into the ancillary category five plans: two early retirement plans; a plan providing supplemental benefits to retirees until the age of 65; a level income option that pays higher monthly benefits to start, and then decreases payments after the retiree is eligible for social security to make up the difference; and life insurance and major medical benefits. This case provided no new indices of difference between accrued and ancillary. The benefits in Petrella paralleled those listed in ERISA as ancillary: early retirement, life insurance and medical plans. The living pension feature, in contrast, parallels none of ERISA's list of ancillary or nonaccrued benefits. And, again, the Petrella court looked to the terms of the plan to determine into which camp its benefits fell.
 
 
 43
 The terms of the IAM Plan support our conclusion that Shaw's living pension benefits were accrued. The plan takes explicit form in the IAM Constitution and the IAM Pension Plan booklet. In the Constitution, the monthly pension benefit is described in terms of a formula. The formula contains three numbers: years of service, the 2.5% rate, and the salary by which the product of these two numbers is to be multiplied. In paragraph one of Section 7, the salary is described as the participant's "current monthly salary immediately prior to his retirement date." In paragraph two of that section, the salary is described as "the salaries for positions corresponding to those in which they were employed immediately prior to their retirement ...." Thus, the living pension "adjust[s]" the basic formula for determining benefits at normal retirement, rather than providing a separate, unfunded, optional plan like medical coverage or early retirement. It describes the multiplicand; it does not provide a separate formula or benefit. When the pension plan booklet shows exemplary pension benefit computations, it shows the "salary" figure as a multiplicand; it shows no separate formula or benefit to be added. Cf. In re W.S. Dickey Clay Manufacturing, 720 F.2d 25, 27 (10th Cir.1983) (even where the terms of the pension plan explicitly retain the power to change the multiplier in the benefit determination formula, the benefits are not forfeitable). The living pension feature was therefore an accrued benefit, just like the rest of Shaw's pension benefits.
 
 
 44
 The IAM declined to take advantage of the statutory escape valve that allows the Secretary to approve amendments decreasing accrued benefits upon a showing of substantial business hardship. 29 U.S.C. Sec. 1082(c)(8). Perhaps the IAM can now submit its discussion of financial hardship, which is irrelevant to our decision, to the Secretary. We see no time limit on applications brought under that escape valve section.
 
 
 45
 III. The district court did not err in declining to award prejudgment interest.
 
 
 46
 On cross-appeal, Shaw challenges the district court's decision to deny him prejudgment interest. He asserts that in this case, an award of prejudgment interest is necessary to achieve full compensation.
 
 
 47
 "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir.1971). See also Maxwell v. Lucky Construction Co., 545 F.Supp. 213, 215-16 (C.D.Cal.1982). The district court in this case explicitly balanced the equities:
 
 
 48
 [T]he adoption of the pension plan amendment ... was not attended to by any consideration of bad faith or ill will. Additionally, the issue on which the court invalidated the amendment (i.e., failure to comply with Section 204(c) of ERISA) is a genuine and complicated issue. Lastly, the restoration of the original "living pension" feature to plaintiff and other retirees similarly situated who retired on or before January 1, 1977, will add approximately $25,000,000 of additional unfunded liabilities to the IAM Pension Plan, and will require an additional annual Union contribution of some $1,800,000. Under the circumstances, the Pension Plan should not be further burdened with the addition of prejudgment interest ....
 
 
 49
 The additional financial strain that an award of prejudgment interest would place on the IAM could injure other beneficiaries of its pension plan. It could also injure the IAM's own members. Cf. International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 50-51, 99 S.Ct. 2121, 2126-2127, 60 L.Ed.2d 698 (1979) (employee not entitled to punitive damages from the union against whom he brought his breach of duty of fair representation claim, because "[s]uch awards could deplete union treasuries, thereby impairing the effectiveness of unions as collective-bargaining agents."). For all these reasons, the district court's decision declining to award prejudgment interest to Shaw was not in error.
 
 CONCLUSION
 
 50
 Congress determined "that despite the enormous growth in ... [pension] plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans." 29 U.S.C. Sec. 1001(a) (emphasis supplied). The Supreme Court has held, "Congress through ERISA wanted to ensure that 'if a worker has been promised a defined pension benefit upon retirement--and if he has fulfilled whatever conditions are required to obtain a vested benefit--... he actually receives it.' " Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981) (quoting Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980)) (emphasis supplied). Thus, the material available for interpreting ERISA's definition of "accrual" always refers to the terms of the pension plan itself. It is those terms that raise the "anticipat[ion of] retirement benefits" that Congress sought to protect and the "promised ... defined pension benefit" that the Supreme Court has sought to protect.
 
 
 51
 The IAM Plan provided a generous pension to its retired employees. That entire pension benefit--including the living pension feature--was promised, anticipated and accrued. The IAM decreased that accrued benefit by its 1976 amendment. That action occurred after ERISA's vesting requirements already bound labor unions such as the IAM. The IAM's amendment decreasing Shaw's accrued benefit therefore violates 29 U.S.C. Sec. 1054(g).
 
 
 52
 The judgment of the district court is affirmed.