Esther EDDINGTON, wife and next friend for Edgar Earl EDDINGTON, Plaintiff-Appellant,

v.

CMTA—INDEPENDENT TOOL AND DIE CRAFTSMEN PENSION TRUST; Board of Trustees of the CMTA—Independent Tool and Die Craftsmen Pension Trust; Trustees, Thomas Dillon, Lane Farrington, Phillip Weir, Norville Frasca, Harry Greerlof, individually and in their official capacity, Defendants-Appellees.

No. 85–2106.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 1986.

Decided July 18, 1986.

Harriet Prensky, Redwood City, Cal., for plaintiff-appellant.

Williams Hoefs, Ronals F. Garrity, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendants-appellees.

Before CHAMBERS, SNEED, and FARRIS, Circuit Judges.

SNEED, Circuit Judge:

Edgar Eddington's widow appeals the grant of summary judgment against her claim that the pension plan's break-in-employment rule, both as adopted and as applied, violated the Labor Management Relations Act. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

The facts of this case illustrate once more the sometimes harsh precision with which pension trusts operate. On September 1, 1961, a collective bargaining agreement between the Tool and Die Craftsmen and the California Metal Trades Association became effective. That agreement established a pension trust, and the trustees created a pension plan that required employers who were party to the agreement to contribute to the trust for each hour worked by covered employees. Under the pension plan, employees could accumulate two types of pension credit: past service credit and current service credit.

Past service credit recognized an employee's work in the tool and die industry before the effective date of the collective bargaining agreement. To calculate an employee's past service credit, the trustees established a concept known as the "contribution date," which was defined as "the first date for which an Employer is obligated by a Collective Bargaining Agreement to contribute to the Pension Trust." Excerpt of Record (E.R.) at 35 (art. I, section 17 of the plan). An employee's individual contribution date was "the date applicable to the first Employer who makes contributions on behalf of such Employee." *Id.* To be eligible for past service credit, the employee's contribution date had to occur before April 1, 1962. *Id.* at 37 (art. IV, section 1(a) of the plan). Past service was determined in the following way:

> An Employee whose Contribution Date is prior to April 1, 1962 shall be entitled to Pension Credit for the period prior to September 1, 1961 while employed in Northern California as a tool and die maker.... An Employee shall be entitled to a full year of such credit for each Plan Year [September 1—August 31] he was so employed for 1800 hours or more. If an Employee was so employed for less than 1800 hours but for 180 hours or more in any Plan Year, he shall receive one tenth of a year of Pension Credit for each 180 hours of such employment.

*Id.* The general purpose of the "contribution date" concept is clear enough. It was designed to restrict past service credit primarily to those working for employers who signed the September 1, 1961 collective bargaining agreement or became bound thereby within two years.

Current service credit, on the other hand, recognized an employee's work after the effective date of the collective bargaining agreement. Article IV, section 2 of the plan provided:

> For the period commencing on [the effective date], an Employee shall receive a full year of Pension Credit for each Plan Year in which he works in Covered Employment for 1800 hours or more. If he works less than 1800 hours in a Plan Year, an Employee shall receive one-tenth of a year of Pension Credit for each full 180 hours of such work.

*Id.* at 38. "Covered employment" meant employment governed by the collective bargaining agreement. *Id.* at 35 (art. I, section 11).

The amount of pension credit an employee needed in order for his benefits to vest depended on the year that he turned 65. If he turned 65 after 1965, he would need 14 years of pension credit for vested benefits. *See id.* at 35–36 (art. III, section 1). The calculation of total pension credit was subject to the plan's "break-in-employment" rule. Article IV, section 5(a) of the plan provided for cancellation of an employee's previously accumulated pension credit "if, after his Contribution Date, he fails to earn three-tenths of a year of pension credit in a period of two consecutive Plan Years." *Id.* at 38. Three-tenths of a year's credit comes to 540 hours; thus, to avoid the operation of the break-in-employment rule, an employee would have to avoid earning less than 540 credit hours during two consecutive years following his contribution date.

Edgar Eddington worked at Sylvania Electric Products (Sylvania) as a tool and die maker from 1956 to 1965. Sylvania was not a contributor to the pension trust while Eddington worked there; it had not signed the collective bargaining agreement. Thus, Eddington got no past service credit because Sylvania had no "contribution date." In 1965, Eddington began work at Ampex Corporation (Ampex). Ampex had been a contributing employer since the inception of the collective bargaining agreement, so Ampex's, and therefore Eddington's, contribution date was September 1, 1961. Eddington thus possibly became eligible for past service credit.

Ampex laid Eddington off in 1971, leaving him with six years of current service credit. Eddington needed 14 years of pension credit because he reached age 65 after 1965. Only by relying on past service credits could he obtain the fourteen years of pension credit. The pension department, however, frustrated this effort by applying the break-in-employment rule to his employment at Sylvania after 1961. It did this on the basis that Eddington did not earn 540 hours of credit by September 1, 1963, the two years following his "Ampex supplied" contribution date. His failure to earn the required credit stemmed from the fact that his Sylvania employment provided no such credit. Any past service credit was canceled. The pension department also concluded that Eddington incurred a second break-in-employment after 1971 because he did not earn 540 credit hours after his layoff from Ampex between September 1971 and August 1973. The result of this second break-in-employment was to cancel his six years of current service credit with Ampex.

In August 1981, Eddington requested a pension from the trustees. On October 15, 1982, the trustees affirmed the conclusion of the pension department, which had found that Eddington had not accumulated enough service years to be entitled to a pension. They also concluded that he was not entitled to credit for past service time because of the two breaks in employment that he had incurred. In December 1982, he appealed the denial of pension benefits, claiming that he should not have incurred a break-in-employment after August 31, 1963. On February 9, 1983, the trustees again denied his benefits.

Mrs. Eddington then filed a complaint in district court alleging that the trustees had denied her husband his pension benefits in violation of sections 404 and 502(a) of ERISA, 29 U.S.C. §§ 1104 and 1132(a), & section 302(c)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5). Cross-motions for summary judgment were filed on March 19, 1985, and on May 2, 1985, the court granted summary judgment for the defendants. The court held that it had no jurisdiction over the ERISA claims, and Mrs. Eddington does not appeal from this holding. She does appeal from the summary judgment on the LMRA claims.

## II.

### DISCUSSION

█ We review a district court's grant of summary judgment de novo. *E.g., Siles v.*

*ILGWU National Retirement Fund,* 783 F.2d 923, 926 (9th Cir.1986). The standard of review for the trustees' choice of eligibility requirements is determined by reference to *United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). That case distinguished between cases in which the process of collective bargaining established the eligibility requirements of the trust fund and cases in which the trustees established the eligibility requirements *after* the collective bargaining agreement became effective. *See Music v. Western Conference of Teamsters Pension Trust Fund,* 712 F.2d 413, 417 (9th Cir.1983) (quoting *Robinson,* 455 U.S. at 573, 102 S.Ct. at 1232). In the former category, the trustees are bound by the terms of the collective bargaining agreement unless the agreement violates federal law, *see Robinson,* 455 U.S. at 573–74, 102 S.Ct. at 1232–33; in the latter category, the trustees are given broad latitude and their decisions may be overturned only if their actions are arbitrary and capricious. *See Music,* 712 F.2d at 417. Because the trustees created the pension plan after the collective bargaining agreement had been adopted, this case falls into the latter category. Therefore, we examine both the trustees' rules of eligibility and the trustees' application of these rules under the "arbitrary and capricious" standard. *Id.*

### A. *The trustees did not act arbitrarily and capriciously in adopting the break-in-employment rule.*

■ In order to determine whether "trust rules ... are not arbitrary and capricious, unsupported by substantial evidence, instituted in bad faith, or erroneous on a question of law," this circuit applies the "structural defect" test. *See Hurn v. Retirement Fund Trust of the Plumbing, Heating & Piping Industry,* 703 F.2d 386, 389–90 (9th Cir.1983). Basically, the structural defect test, when used to analyze the situation in which a small number of em-

ployees are excluded from benefits, requires the trustees to demonstrate a reason for their rules when those rules have been held to be arbitrary on their face. *Id.* at 390.

■ The district court avoided making a finding about the break-in-service rule's facial irrationality by assuming that the rule was irrational. It then proceeded to hold that the reason the trustees had advanced was rational, *viz.* "to limit the 'universe' of employees to whom the Plan would grant Past Service Credit by limiting such credit to employees who were working for a contributing employer at the time of the Plan's adoption or started working for a contributing employer shortly thereafter." E.R. at 44. A finding of rationality does not require in all cases that the trustees support their reason by showing that the decision was necessary to protect the soundness of the plan. *See Harm v. Bay Area Pipe Trades Pension Plan Trust Fund,* 701 F.2d 1301 (9th Cir.1983):

> Only some decisions need be shown "necessary to protect the soundness of the Fund." ... Other rules may represent a choice among competing policies or rely on behavioral predictions that are not susceptible to verification [and do not require actuarial support]. In this latter group are the break-in-employment rules, which rest on the trustees' prediction that employees will be encouraged to seek continuing employment in the industry, rather than to shift to other industries. Rules that require policy selection or matching of actuarial probabilities to the conditions of an industry fall more fully to the trustees' discretion. The trustees can act in these cases without a showing of financial necessity.

*Id.* at 1306 n. 7 (citations omitted). Limiting the "universe" of potential beneficiaries is reasonable, especially given the rather generous "540 hours in two years" provision for preserving past service credit.[1] We hold that the rule on its face is neither arbitrary nor capricious.

*Ponce v. Construction Laborers Pension Trust,* 628 F.2d 537, 543 (9th Cir.1980): "[T]he actuari-

---

1. Restricting the "universe of eligible employees" also makes sense, given the language in

**B.** *The trustees did not apply the break-in-employment rule in an arbitrary and capricious manner.*

■ Mrs. Eddington also argues that the break-in-employment and contribution date rules deprived her husband of an opportunity to protect his interests by working for a contributing employer between 1961 and 1963. He knew nothing of these rules at that time, she asserts. She relies on *Burroughs v. Board of Trustees of the Pension Trust Fund for Operating Engineers*, 542 F.2d 1128 (9th Cir.1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). *Burroughs* suggested that the break-in-employment rule there at issue was created after the inception of the trust agreement,[2] and that Burroughs did not receive notice of the rule until it was too late for him to preserve his past service credit. *Id.* at 1130. The court held that, because the lack of notice prevented Burroughs from having a "reasonable opportunity to protect [him]sel[f] from [the rule's] impact during the years to which it was retroactively applied," the rule was arbitrary and capricious as applied. *Id.; see Wilson v. Board of Trustees of the Pension Trust Fund for Operating Engineers*, 564 F.2d 1299, 1302 (9th Cir.1977) (referring to *"Burroughs* excuse" for an employee's failure to remedy his break-in-employment before notification of the rule).

Without regard to whether in *Burroughs* the break-in-employment rule was changed after the inception of the plan, the situation here is quite different. In *Burroughs* the employee worked for a contributing employer at the inception of the trust agreement. *See Burroughs v. Board of Trustees of the Pension Trust Fund for Operating Engineers*, 398 F.Supp. 168, 173 (N.D. Cal.1975), *aff'd*, 542 F.2d 1128 (9th Cir.

1976). His employer or the union could easily have notified him at the time of either the plan's inception or its modification of the break-in-employment rule. Eddington, on the other hand, did not work for a contributing employer when the break-in-employment rule was adopted. This is a controlling difference. Notification of all employees of firms not covered by the September 1, 1961 collective bargaining agreement would be impractical.

*Ponce v. Construction Laborers Pension Trust*, 628 F.2d 537 (9th Cir.1980), supports this view. *Ponce* involved a worker whose pension plan applied a break-in-employment rule to work done before the inception of the pension plan (past service). As the court explained,

[I]n *Burroughs*, the employee's past service had been performed *prior* to the inception of the pension plan, but his break in service had occurred *after* the inception of the plan when the employee would have had a present ability to conform his work pattern to the rule's requirements, if he had known them. Plaintiff argues that *Burroughs* requires that plan participants have notice of all eligibility rules, even those rules that apply to service that is entirely performed before the plan is adopted. If plaintiff's theory was accepted, there could be no rules applied to past service credit because there could be no notice of what rules might be adopted by a pension plan not yet in existence.

*Id.* at 545 (emphasis in original). We acknowledge that this case does not fall squarely within either *Burroughs* or *Ponce.* Nonetheless, *Ponce* instructs that we should not read into these plans impractical interpretations in order to save an individual's pension rights. We therefore

al soundness of a pension plan is influenced to an appreciable degree by the exclusion of even one otherwise eligible plan participant."

**2.** *Compare* 542 F.2d at 1130 (referring to the retroactive application of the rule), *with id.* (noting that Burroughs had not been "notified of the rule until more than two years after the plan was in effect"). The lower court's opinion is only marginally helpful. It noted that the pension plan had been amended twice, 398

F.Supp. 168, 170–71 (N.D.Cal.1975), and distinguished between the pension plan "[a]s executed," *id.* at 170, and "[a]t the time plaintiff applied for his pension," *id.* at 172. The opinion also referred to the original break-in-employment rule without a qualifier such as "[a]t the time plaintiff applied for his pension," but referred to the modifications of the rule with that qualifier. *Id.*

refuse to hold that, once the trustees adopted the pension plan, they were required to publicize the break-in-employment rule in the industry as a whole, so that even employees of noncontributing employers would know of the rule. Such a rule would impose a hardship on employers and trustees and introduce an adventitious element into the operation of this plan.

C. *Eddington's last break-in-employment was not involuntary.*

Finally, Mrs. Eddington argues that Mr. Eddington's last break-in-employment was involuntary. Even if Eddington received no notice before working at Ampex, he earned six years of credit by working there before he was laid off. Two years after the layoff, he incurred another break-in-employment. If his lack of employment with a contributing employer was involuntary, that break-in-employment should not be counted against him. *See Lee v. Nesbitt,* 453 F.2d 1309, 1312 (9th Cir.1972). But we find no evidence in the record to that effect. We affirm the grant of summary judgment.

AFFIRMED.