Joseph B. D'ORAZIO, Charles Hrabcsak, Joseph E. Wiencek, Frank A. Kern, Charles E. Abraham, George Pihiou, William Horwatt, Joseph G. Wiszczor, Thomas Polowischak, Frank Mancuso, James R. McCoy, Elizabeth Paris, John Yanik, Al DeGennaro, Howard Franell, Dennis Crile, Dennis Delvecchio, Alicide Dufresne, Jack Felix, Carl Maggi, Jr., Edwin Sherman, Jr., Stanley S. Lojek, Daniel Lucero, Donald W. Cox, John R. Byers, Sr., Edwin F. Dems, Regis, C. Engel, Jesse K. Lough, Harry M. Hildebrand and Richard E. Kotar, Plaintiffs,

v.

McGRAW EDISON POWER SYSTEM DIVISION, Cooper Industries, Inc., Cooper Power Systems, Inc., United Steelworkers of America A.F.L.–C.I.O., Local # 3968 of the United Steelworkers of America A.F.L.–C.I.O., and Local # 6449 of the United Steelworkers of America A.F.L.–C.I.O., Defendants.

Civ. A. No. 88–2553.

United States District Court, W.D. Pennsylvania.

June 17, 1992.

---

John F. DiSalle, Washington, Pa., Jerry S. Eisenberg, Swensen, Perer & Johnson, Pittsburgh, Pa., for plaintiffs.

Mark Hornak, Richard J. Antonelli, Buchanan Ingersoll, David Goldman, United Steelworkers of America, Pittsburgh, Pa., for defendants.

## OPINION

DIAMOND, District Judge.

A group of employees commenced this action against their employer and their union under § 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185. This lawsuit constitutes what has become known as a "hybrid" action in that plaintiffs allege (1) that their employer (McGraw Edison and Cooper Industries, Inc., "the company" or "the employer") has violated the terms and conditions of their collective bargaining agreement and (2) that defendants United Steelworkers of America A.F.L.-C.I.O., Local # 3968 of the United Steelworkers of America A.F.L.-C.I.O. and Local # 6449 of the United Steelworkers of America A.F.L.-C.I.O. (collectively "Union") have violated their federal law duty to represent fairly their members. *See* Seconded Amended Complaint at ¶ 62.

Specifically, plaintiffs allege that defendants, by signing a May 1988 agreement, violated the terms and conditions of a March 5, 1985, memorandum between Cooper and the Union. Pursuant to the 1985 agreement, which expired on April 1, 1988, the Union made certain wage and benefit concessions to Cooper. Under the May 5, 1988, agreement, Cooper was obligated to make a $5,000.00 lump sum bonus to "all employees on the *active payroll* on March 31, 1988, or by the ratification date if within two months thereafter" as a form of compensation to the employees for making the 1985 wage concessions. Plaintiffs maintain that defendant employer is "unjustly enriched" by virtue of its refusal to pay the $5,000.00 lump sum award to each plaintiff. Complaint at ¶ 46. Plaintiffs allegedly are ineligible for the payment because they were either retired or on ex-

tended injury leave or on workers' compensation leave. That is, plaintiffs were not on the "active payroll" as of March 31, 1988. Defendants interpreted the phrase "active payroll" to mean that employees had to be "actively working" in order to receive the $5,000 payment.

Thus, the Union allegedly "breached its duty of fair and adequate representation to plaintiffs and acted in bad faith in negotiating the 1988 memorandum by allowing Cooper to discriminate against plaintiffs due to their age, retirement, sickness, injury, physical impairment and/or lay-off status." Complaint at ¶ 62. Moreover, the Union allegedly violated its duty of fair representation by its bad faith refusal to process the plaintiffs' grievances as provided under the Union's bylaws. Complaint at ¶ 60.

Defendants have filed their respective motions for summary judgment, contending that they are entitled to judgment as a matter of law and that there is no genuine dispute of material fact. The court agrees, and for the reasons set forth below, it will grant defendants' motions.

## I. *Facts*

Collective bargaining agreements govern the terms and conditions of employment for the company's production and maintenance employees (Local 3968) and office and technical employees (Local 6449). These agreements were effective August 10, 1983 and they were originally set to expire on July 21, 1986. The 1983 agreements were modified and extended by a memorandum agreement entered into by the International Union and the company on March 5, 1985. By its own terms, this memorandum terminated on April 1, 1988. The 1985 document resulted from

> discussions [between the Company and the Union] involving a request by the Company for a reduction in hourly wage and benefit costs because of the losses incurred at the Canonsburg plant in 1983 and 1984 and which are expected to grow in 1985 and beyond; ....

1985 Memorandum at ¶ 1. The 1985 memorandum memorialized certain wage concessions on the part of the employees and it contained a "restoration" provision which provided that a share of the company's profits in a given year would be rolled into the hourly wages of employees for the following year. 1985 Memorandum at ¶ 7. All restoration payments were to be made in the form of hourly wage additives. Consequently, an employee who did not work in a particular year and thus did not receive wages, would not receive any benefit from the restoration payments paid out that year. Snyder Affidavit at ¶ 3. The restoration provision states that the wage additives

> shall cease at such time as the amount of concessions has been restored to wages (including roll-up impact) and benefits in the bargaining units or until April 1, 1988, whichever occurs sooner.

1985 Memorandum at ¶ 7.

In view of the April 1, 1988, deadline, in early 1988 the company and the Union entered into negotiations for a new collective bargaining agreement. Among the counter-proposals was the company's offer to pay a $3,000.00 lump-sum payment to active employees as of March 31, 1988; this proposal also provided for health care benefit readjustments. Snyder Affidavit at ¶ 4. The Union rejected the company's proposal. Snyder Affidavit at ¶ 4; Crouse Affidavit at ¶ 2.

Even though the 1985 memorandum expired on April 1, 1988, the company and the Union agreed that the terms of that memorandum would govern the employment relationship pending negotiations for a new agreement. These negotiations produced the 1988 memorandum which was ratified by Local 6449 and Local 3968. The Union achieved its objectives with regard to health benefits and the 1988 memorandum called for "a general wage increase to all employees of seventeen cents at ($0.17) per hour retroactive to January 1, 1988" and "a general wage increase of four percent (4%) beginning April 3, 1988." 1988 Memorandum at ¶¶ 3, 6. Although the company did not give in to the Union's demands that wage restoration be continued in the new agreement, Snyder Affidavit at ¶ 10, the 1988 memorandum did provide for a lump

sum $5,000.00 payment for employees on the active payroll on March 31, 1988, or on the date the 1988 memorandum was ratified, provided this occurred within two months of March 31, 1988. 1988 Memorandum at ¶ 2.

In contrast to prior proposals, the 1988 memorandum provided that the lump-sum payment was to be paid "to inactive employees who went on layoff, workers compensation, or A & S [accident and sickness] since January 1, 1988, and who returned to work within calendar year 1988." 1988 Memorandum at ¶ 2. The 1988 memorandum stated that the parties "[c]onsider the restoration provisions of March 5, 1985 Memoranda of Agreement to have expired according to its terms on April 1, 1988." *Id.* Thus the record before the court indicates that after rejecting the Union's attempts to provide for a continuation of the restoration wage additives, the company agreed to a one time lump-sum payment. Snyder Affidavit at ¶¶ 10, 11. The record also indicates that during negotiations, the Union and the company explicitly discussed and understood that the proposed 1988 memorandum's reference to employees on the "active payroll" referred to working employees. Snyder Affidavit at ¶ 12.

The 1988 memorandum was submitted to the membership of the local unions on May 24, 1988, and was rejected by both Local 6449 and Local 3968. Snyder Affidavit at ¶¶ 12, 13; Crouse Affidavit at ¶¶ 14, 15. Before submitting the 1988 memorandum to a second vote, the Union extracted from the company an agreement that the $5,000.00 payment would be made to employees on the active payroll on March 31, 1988, or as of the date of ratification, even if beyond two months. Snyder Affidavit at ¶ 16. Accordingly, on June 10, 1988, Local 6449 voted to ratify the 1988 memorandum and on June 20, 1988, Local 3968 voted to accept the 1988 memorandum. Crouse Affidavit at ¶ 6; Snyder Affidavit at ¶ 17. The $5,000.00 lump-sum payment was paid to eligible employees on or about June 23, 1988.

Local 3968 discussed the 1988 memorandum at its regular monthly meeting on June 14, 1988, and minutes from this meeting indicate that eligibility for the lump-sum payment was discussed. *See* Minutes from June 14, 1988, Meeting attached to Fabian Affidavit.

Only one plaintiff, Mr. DeGennaro, filed a complaint relating to the payment of the $5,000.00. The grievance procedure in the collective bargaining agreement is initiated by an employee filing "a complaint." *See* 1983 Agreement at 34–35; Sohyda Affidavit at ¶ 2. The complaint was filed on August 11, 1988, and alleges that DeGennaro was "wrongfully represented by the Union" because he did not qualify for the $5,000.00 payment; the grievance does not allege a breach of the labor agreement. Mr. DeGennaro stated that he knew that he was not "included" in the class of employees who were eligible to receive the $5,000.00 payment, as he understood that an employee had to be actively working in order to receive the money. DeGennaro Deposition at 13–15, 36, 76–77. DeGennaro Deposition.

Mr. DeGennaro's complaint was disapproved by the Local Union grievance committee on August 26, 1988, because it had no merit and it was returned to DeGennaro the same date. Sohyda Affidavit at ¶ 4; Snyder Affidavit at ¶ 22. No other plaintiff filed a complaint.

## II. *Analysis*

Summary judgment may be entered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "As to materiality, the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of demonstrating the absence of a dispute over material facts, regardless of which party would have the burden of persuasion at trial. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (*en banc*), *cert. dismissed,* 483 U.S. 1052, 108

**1302**

S.Ct. 26, 97 L.Ed.2d 815 (1987). A party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 328, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). When reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving. *Lang v. New York Life Ins.*, 721 F.2d 118, 119 (3d Cir.1983). The non-moving party's allegations must be accepted as true and all conflicts must be resolved in her favor. *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

■ However, a non-moving party must produce more than a mere scintilla of evidence to avoid summary judgment. *Anderson, supra*, 477 U.S. at 262, 106 S.Ct. at 2517. Thus, "summary judgment must be granted 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988) (*quoting Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). Consequently, "a mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be a *genuine* issue of *material* fact." *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis in original).

■ As one would expect, in a § 301 hybrid suit, the ultimate burden of persuasion remains with the plaintiff to prove that the collective bargaining agreement was violated by her employer and that the Union breached its duty to represent fairly that employee's interest. Generally, to establish a breach of the duty of fair representation, an employee must show that the Union's conduct was arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *DelCostello v. International*

*Brotherhood of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 2291, 76 L.Ed.2d 476 (1983) (in order to prevail in hybrid § 301 suits, an employee must establish (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation).

■■ Labor unions owe their members a duty of fair representation because they are invested by statute with the power to bargain exclusively on the behalf of their membership; unions thus may not use their power intentionally to disadvantage certain members of the bargaining unit. *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In assessing the duty of fair representation, the union must be accorded a "wide range of reasonableness" to enable it to perform effectively, but this discretion is subject to "good faith and honesty of purpose." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563–64, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976) (citations omitted).

■ Plaintiffs allege that the Union breached its duty because it agreed to a deal which discriminated against them and because the union allegedly refused to process grievances. Turning to the first theory of breach, in the landmark case *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Supreme Court rejected an argument that a union unfairly represented certain employees after the union negotiated a labor agreement granting some employees seniority credit for time spent in the military prior to coming to work at Ford. As a result of this agreement, plaintiffs were laid off while employees with less years at Ford (but more in the military) remained working. The *Huffman* plaintiffs argued that like race, pre-employment military service was an illegitimate criterion upon which to base contractual distinctions. The Court refused to narrow union latitude in bargaining, not only because this would undermine union power as the legitimate representative of a bargaining unit, but also because it would mandate federal court oversight of the terms and conditions

of collective bargaining agreements. The Supreme Court wrote:

> [i]nevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
>
> Compromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables.

*Ford Motor Co.*, 345 U.S. at 338, 73 S.Ct. at 686.

The Supreme Court has continued to sustain the broad degree of discretion afforded to unions when bargaining on behalf of their members. In *Air Line Pilots Assoc. Int'l v. O'Neill*, 499 U.S. ——, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), the Court held that "the final product of the bargaining process may constitute evidence of a breach of [the duty of fair representation] only if it can be fairly characterized as so outside a 'wide range of reasonableness' that it is wholly 'irrational' or 'arbitrary'." 499 U.S. at ——, 111 S.Ct. at 1129, 113 L.Ed.2d at 65 (*citing Ford Motor Co. v. Huffman*, 345 U.S. at 338, 73 S.Ct. at 686). In *O'Neill*, the Court reversed the Fifth Circuit's determination that the district court was improvident in granting summary judgment in favor of the union on the basis that the Union had not breached its duty of fair representation. In *O'Neill*, the pilots union agreed to settle a strike against Continental Airlines and pursuant to the agreement, the striking pilots were offered the option of (1) settling all outstanding claims with the airline and participating with non-striking pilots in the allocation of certain positions, or (2) electing not to return to work and receiving severance pay, or (3) retaining their individual claims against the airline and becoming eligible for work only after the reinstatement of all the settling pilots. The union was sued by certain pilots who insisted that the settlement agreement discriminated against striking pilots, thereby constituting a breach of the union's duty of fair representation.

The Supreme Court rejected the interventionist posture taken by the Fifth Circuit Court of Appeals. The Supreme Court held that the union rationally accepted a compromise between the claims of the two groups of pilots. Justice Stevens, writing for a unanimous Court, stated that the Fifth Circuit's determination that the union could have breached its duty of fair representation by entering into a strike settlement agreement providing less for its members than what they would have received from unilaterally abandoning the strike, "authorizes more judicial review of the substance of negotiated agreements than is consistent with national labor policy." *Id.* 499 U.S. at ——, 111 S.Ct. at 1135, 113 L.Ed.2d at 64. The Court elaborated on the policy of deference to union stewardship in resolving collective bargain disputes:

> ... Congress did not intend judicial review of a union's performance to permit the Court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.

*Id.* at ———— ——, 111 S.Ct. at 1135, 113 L.Ed.2d at 64–65 (citations omitted). Consequently, a settlement "is not irrational simply because it turns out in retrospect to have been a bad settlement." *Id.* at ——, 111 S.Ct. at 1136, 113 L.Ed.2d at 65 (emphasis in original). *See also Groves v. Ring Screw Works, Ferndale Fastener Di-*

*vision,* 498 U.S. 168, 111 S.Ct. 498, 112 L.Ed.2d 508 (1990) (federal labor law encompasses a policy favoring the peaceful settlement of labor disputes); *Medlin v. Boeing Vertol,* 620 F.2d 957, 961 (3d Cir. 1980) (absent wholesale irrationality, to violate the duty of fair representation, it is necessary that the union act with bad faith motivation).

With these principles in mind, we turn now to the specifics of this case. As we discuss below, plaintiffs have failed to meet their burden of production in opposing defendants' motion for summary judgment because they have not demonstrated that there is a genuine dispute as to material fact. *See Anderson, supra* 477 U.S. at 262, 106 S.Ct. at 2517. They have done no more than assert that they have suffered from discrimination at the hands of the union and that the company breached the 1988 agreement by interpreting the term "active payroll" to refer to those employees who were actively working. *See* Plaintiffs' Response to Defendant Unions' Statement of Material Facts.

Plaintiffs do not dispute that the Union repeatedly sought to broaden eligibility for the $5,000.00 lump-sum payment; rather, they are aggrieved by the fact that at the end of the negotiations, they were not entitled to this payment. Snyder Affidavit at ¶ 13. This distinction is significant because it undermines plaintiffs' theory that the Union acted with *bad faith* motivation and thus, breached its duty of fair representation. Indeed, *O'Neill* commands that plaintiffs demonstrate that the 1988 memorandum is "so far outside a 'wide range of reasonableness', that it is wholly irrational" or that there be a showing of bad faith. *O'Neill, supra* 499 U.S. at ——, 111 S.Ct. at 1129, 113 L.Ed.2d at 65. In light of *O'Neill,* plaintiffs must demonstrate that it is "fully irrational" for working employees to receive a contractual benefit that nonworking employees do not receive, or that this distinction provides an inference of bad faith or a discriminatory animus on the part of the union. In order to sustain this hybrid action, it is also necessary that the company breached the collective bargaining agreement by interpreting the phrase "active payroll" to mean only those employees who were working at the time of the payment award.

The court finds that the eligibility restrictions on receipt of the payment constituted reasonable approximations of the 1985 memorandum's proviso that an employee actually be at work in order to benefit from the company's profits. Snyder Affidavit at ¶ 3. Indeed, if pre-employment military service was a legitimate basis for contractual distinctions in *Huffman,* the court believes that the parties in this suit rightly could distinguish between active and nonactive employment in making a payment award. The record before the court indicates that the Union attempted to maximize the welfare of its members by insisting upon the retention of the superior health care plan as well as by pushing for general wage increases. Simply because some members of the Union are dissatisfied with the deal does not provide grounds for this lawsuit, particularly in the absence of specific facts which indicate that the Union acted arbitrarily or in bad faith, or for discriminatory motives.[1] To reiterate:

---

1. The record before the court indicates that the restoration process should not be confused with the concept of "restitution", in that employees working in 1985 who had their wage rate reduced were not to be "paid back" over time. Instead, the wage rate *itself* was to be restored and those employees who would be working under the "restored" wage rate would garner the benefit, if any, of the restoration. In other words, any deal structuring the restoration process was not to be "a pay back", rather, it was to be a forward looking wage increase. Indeed, the 1985 agreement itself states that any addition to the wage rate would cease as of April 1, 1988, absent an agreement by the company that it would continue and *without regard* to whether the wage rate had been "fully restored." *See* 1985 Agreement.

With regard to those employees who were on A & S or workers compensation or who had been temporarily laid off, it is difficult to sustain a claim that the Union acted out of discriminatory purposes in view of the fact that when the new deal was struck, the Union had no way of knowing who would return to work and when and who would not be earning those wages. The record reflects, therefore, that the parties reached a reasonable accommodation in that employees who had most recently stopped working due to workers compensation, A & S or

"[t]he complete satisfaction of all who are represented is hardly to be expected." *Huffman*, 345 U.S. at 338, 73 S.Ct. at 686. Additionally, even if the court assumes (which it does not) that in negotiating the 1988 memorandum, the Union breached its duty of fair representation, plaintiffs have failed to established that "but for" the Union's conduct, the company would have agreed to give plaintiffs the $5,000.00 lump-sum payment. *Humphrey v. Moore*, 375 U.S. 335, 350–51, 84 S.Ct. 363, 372–73, 11 L.Ed.2d 370 (1964); *Deboles v. Trans World Airlines*, 552 F.2d 1005, 1019 (3d Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Wood v. International Brotherhood of Teamsters, etc.*, 807 F.2d 493, 503 (6th Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987).

▋ Nor have plaintiffs mustered facts sufficient to preclude summary judgment on the theory that the Union breached its duty of fair representation by failing to process grievances. The Supreme Court in *Vaca* rejected the proposition that individual union members should be able to compel the processing of grievances, as such an outcome would undermine the union's position as the legal representative of its bargaining unit. If an individual employee "could compel arbitration of grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined...." *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917. It is through this settlement process, that frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. *Id.* at 192–93, 87 S.Ct. at 918–19. *See also Findley v. Jones Motor Freight, et al.*, 639 F.2d 953, 958 (3d Cir.1981) (mere refusal to grieve a complaint does not establish a breach of duty, even if the complaint was meritorious). Indeed, proof that the Union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation. *Id.* at 959 (*citing Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir.1970)). Rather, a plaintiff must establish that the Union proceeded in a bad faith or arbitrary manner and that its shortcomings prejudiced the member's cause. Plaintiffs have made no such showing in this case. The record before the court indicates that both the Union and the company understood that the terms of the 1988 memorandum rendered plaintiffs' grievance meritless; that is, plaintiffs sought relief under the terms of an agreement which did not provide for that relief. *See, e.g., Findley, supra.*

Moreover, only one plaintiff, Mr. DeGennaro, filed a grievance with the Union. The record before the court is devoid of evidence which indicates that the local Union's refusal to grieve DeGennaro's complaint was either irrational or done in bad faith. *See* Sohyda Affidavit.[2] *See Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir.1970) (a union has an obligation to act fairly under the collective bargaining agreement and not to assert or press grievances which it believes in good faith do not warrant such action).

▋ The court therefore concludes that the Union did not breach its duty of fair

layoff (i.e. since January 1, 1988) and who had returned to work in a relatively short period of time (i.e. within calendar 1988), would receive the $5,000.00 lump-sum payment upon their return. However, those employees who had been on worker compensation, A & S or layoff for an extended period of time and who would not return to work within calendar year 1988, would not receive the lump-sum payment. This bright line rule reflected an accommodation between the Union and the company; plaintiffs have failed to indicate how it reflects bad faith on the part of the Union.

2. Indeed, the Union avers that it could not process the complaint even if it had deemed the complaint worthy, in view of the fact that the complaint was untimely. The collective bargaining agreement states:

Any grievance which has not been placed in writing and submitted within fifteen (15) working days after the date on which it occurred shall be null and void and need not be recognized by either party to this agreement. 1983 Agreement at 34. DeGennaro's complaint was filed on August 11, 1988, two months after the negotiation of the payment, seven weeks after it was paid, and over seven weeks after DeGennaro was told by Snyder at the ratification vote that he was ineligible to receive the lump-sum payment. Snyder Affidavit at ¶ 20.

representation and accordingly, plaintiffs' hybrid action must fail in view of the fact that such suits must demonstrate *both* a breach of the collective bargaining agreement on the part of the employer and a breach of the duty of fair representation on the part of the Union. *DelCostello,* 462 U.S. at 165, 103 S.Ct. at 2291; *Findley v. Jones Motor Freight,* 639 F.2d 953, 957–58 (3d Cir.1981).

 The court feels constrained, however, to remark that the record also reflects a dearth of evidence in support of the argument that the company breached the collective bargaining agreement. According to the terms of the 1988 memorandum, employees on the "active payroll" as of certain dates were to receive the lump-sum payment. The 1988 memorandum states that "inactive" employees (defined as employees who are on workers compensation, A & S or layoff) are not entitled to the payment unless they returned to work within 1988. As to plaintiff-retirees, i.e. non-employees, the 1988 memorandum contains no suggestion that they are entitled to the lump-sum payment. Nor, for that matter, does the Union owe retirees a duty of fair representation. *See Central States Pension Fund v. Central Transport,* 472 U.S. 559, 576 n. 18, 105 S.Ct. 2833, 2843 n. 18, 86 L.Ed.2d 447 (1985); *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 176–82, 92 S.Ct. 383, 396–99, 30 L.Ed.2d 341 (1971). *See also United Mine Workers Health and Retirement Fund v. Robinson,* 455 U.S. 562, 574–75, 102 S.Ct. 1226, 1233–34, 71 L.Ed.2d 419 (1982) (former members and their families may suffer from discrimination in collective bargaining agreements because the union need not affirmatively represent them or take into account their interests in making bona fide economic decisions on behalf of those whom it does represent). Thus, there is no indication that the Union and the company contravened the clear language of the restoration provision.

 It is an axiom of contract law that where contract language is ambiguous (which is not the case here), it must be construed so as to give effect to the intent of the parties who formulated the contract. *See Bagsby v. Lewis Bros., Inc.,* 820 F.2d 799, 802 (6th Cir.1987) (courts should hesitate to disagree with the interpretation agreed upon by both parties to the agreement); *Board of Trustees v. California Co-op. Creamery,* 877 F.2d 1415, 1426 (9th Cir.1989) (if a provision of a CBA is ambiguous, its interpretation depends on the intent of the parties to the CBA at the time of its execution). Both the company and the Union agree that the meaning of the term "active payroll" excludes plaintiffs and this erects a presumption that no breach of the collective bargaining agreement has occurred and plaintiffs cannot simply rely on assertions to the contrary when faced with a motion for summary judgment. *See* Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 13.

 Defendants further argue that under the most generous interpretation of the statute of limitations, plaintiffs' claims against the Union are time barred. The court agrees. Actions for breach of the duty of fair representation against a union are controlled by the six-month limitations period of § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b); *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Vadino v. A. Valey Engineers,* 903 F.2d 253, 260 (3d Cir.1990). The Court of Appeals has noted that:

> The six-month period begins to run [in a duty of fair representation action] "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation."

*Hersh v. Allen Products Company, Inc.,* 789 F.2d 230, 232 (3d Cir.1986). The record before the court indicates that the six-month limitations period started to run in the spring or summer of 1988 on all claims against the Union and that plaintiffs did not file suit against the Unions until over a year later on September 22, 1989.[3]

 The statute of limitations was triggered either on June 23, 1988, when the

---

3. On March 17, 1989, plaintiffs filed a motion

for leave to file an amended complaint naming

company paid the lump sum to eligible employees or on August 9, 1988, when employees were informed once again as to the eligibility requirements. Plaintiffs either knew or should have known about the terms of the 1988 memorandum by this time. Indeed, numerous plaintiffs complained in the summer of 1988 about their failure to receive the lump-sum payment. These plaintiffs include Mr. Yanik, Mr. D'Orazio, Mr. Sherman, Mr. Pihiou, Mr. Deems, and Mr. Franell. Mr. Snyder received a letter postmarked July 1, 1988, in which plaintiffs' counsel wrote to the company threatening to institute legal proceedings on behalf of the plaintiffs if the company did not pay them the lump-sum bonus of $5,000.00. Snyder Affidavit at ¶ 21. Thus, even if the court assumes that the limitations period commenced towards the end of August, 1988 (marked by the end of the two week time period the Union had in order to file a grievance), and even if the court assumes that that period was tolled on March 17, 1989, when plaintiffs filed their motion for leave to file an amended complaint, that March motion was clearly beyond the six-month limitation period set forth in § 10(b). *See Childs v. Pennsylvania Federation Brotherhood of Maintenance Way Employees*, 831 F.2d 429, 435 (3d Cir.1987) (courts may select date of union's refusal to grieve complaint as the date for the accrual of the statutes of limitations in a suit against the union); *Grasty v. Amalgamated Cloth & Textile Workers Union*, 828 F.2d 123, 133 (3d Cir. 1987) (limitations period commenced when the futility of union appeals became apparent), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988).

█ Nor, for that matter, does it appear that plaintiffs have a relation back argument pursuant to Fed.R.Civ.P. 15(c), which plaintiffs do not assert themselves, but which the court shall consider on its own. If the March 17, 1989, motion for leave to file an amended complaint and the September 22, 1989, filing of the amended complaint are to relate back to the original October 31, 1988, complaint, the criteria set forth in Fed.R.Civ.P. 15(c) must be satisfied and it does not appear that they are. Although the claim asserted in the amended pleading "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading", *see* Fed.R.Civ.P. 15(c)(2), plaintiffs have failed to satisfy the requirements set forth in Fed.R.Civ.P. 15(c)(3). That is, plaintiffs have failed to demonstrate that "but for a mistake concerning the identity of the proper party" the action would have been brought against the party to be brought in by amendment, namely the Union. The October 31, 1988, complaint alleges only arbitrary and bad faith conduct on the part of the company; it makes no allusions as to the Union. Thus, the court finds the seconded amended complaint to be beyond the six-months statute of limitations.

For the foregoing reasons, defendants' motions for summary judgment shall be granted.

---

the Union as defendants and adding entirely new allegations to those in the original complaint. (Docket No. 4). On May 26, 1989, this court granted plaintiffs thirty days to file an amended complaint (Docket No. 7). Plaintiffs failed to act in accordance with that May 26, 1898, order and this court on June 28, 1989, granted plaintiffs an additional thirty days to file the amended complaint. (Docket No. 8). Plaintiffs failed to comply with the schedule set forth in the June order and on July 19, 1989, the court ordered plaintiffs to file the amended complaint within sixty days.