**John R. ARENA et al.**

v.

**CITY OF PROVIDENCE et al.**

No. 2005–207–A.

Supreme Court of Rhode Island.

April 12, 2007.

Joseph F. Penza, Jr., Esq., Warwick, for Plaintiff.

Jeffery W. Kasle, Esq., for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Chief Justice WILLIAMS, for the Court.

In what we hope will be the final chapter of this contentious dispute over pension rights, the defendants, the City of Providence and members of the City Council of the City of Providence (defendants), ap-

---

peal a bifurcated judgment of the Superior Court in favor of the plaintiffs, retired members of the Providence Fire Department and the Providence Police Department or their widows (plaintiffs).[1] The defendants first contend that the trial court erred when it determined that the Superior Court had jurisdiction to decide the status of the plaintiffs' rights to a disputed cost of living adjustment (COLA). In addition, the defendants argue that the trial justice erred when she found that: (1) the Firefighters'[2] Arbitration Act, G.L. 1956 chapter 9.1 of title 28, did not apply in determining the firefighter plaintiffs' contractual rights or benefits; (2) all the plaintiffs were eligible for COLA benefits as defined in a Providence ordinance; and (3) the defendants were not authorized to change or modify this ordinance to decrease already-retired plaintiffs' COLA benefits. The plaintiffs cross-appeal, alleging that the trial justice erred in rejecting their assertion that the terms of the last ratified collective bargaining agreement (CBA) also govern the plaintiffs' COLA benefits. For the reasons that follow, we affirm in part and reverse in part the Superior Court's judgment.

**I**

**Facts and Travel**

The history of the fire and police department pension controversy is rife with complexity. The dispute at the origin of this appeal stems from two separate contract negotiations: one in 1989 between the City of Providence (the city) and the Fraternal Order of Police (FOP), and the other in

---

1. The description and grouping of these plaintiffs is set forth in Part ID of this opinion *infra*.

2. Although the Firefighters' Arbitration Act, G.L.1956 chapter 9.1 of title 28, as well as other materials, includes two spellings for firefighter—firefighter and fire fighter—in the interest of uniformity we will use only one spelling: firefighter. Whatever the word, it takes nothing away from the courage and bravery required of these "first responders."

1990 between the city and the International Association of Firefighters (IAFF). Both contract negotiations changed the COLA benefits available to each group of represented employees. These negotiations are merely one chapter in an epic traveling through too many courtrooms for an extended period of time, and now presents multiple issues of first impression in this state.

## A

### The Present Litigation

The city's retirement system itself has an intricate history. Originally, it was within the General Assembly's exclusive authority to legislate retirement benefits for city employees by enacting public laws. After the Providence Home Rule Charter (charter) was enacted in 1980, the Providence City Council (council) replaced the General Assembly as the legislative authority whose role would be to establish the municipal pension program. The pension program sets forth a "comprehensive system of contributions, benefits, and regulations relating to pensions to be paid" to the city's employees, including firefighters and police officers. *Betz v. Paolino*, 605 A.2d 837, 838 (R.I.1992). On January 3, 1983, the charter's effective date, the retirement board, previously an independent corporate body, became a city board subject to the council's legislative authority.

The council did not invoke its authority to legislate retirement benefits until 1991, eight years after the charter's effective date. In the interim, the FOP and the IAFF each separately engaged in collective bargaining; the IAFF and the city entered into a CBA, later ratified by the council, for the term of July 1, 1990,

through June 30, 1992 (1990–92 fire CBA); the FOP and the city entered into a CBA, also ratified by the council, for the term of July 1, 1989, through June 30, 1991 (1989–91 police CBA).[3]

Before the 1989–91 police CBA and the 1990–92 fire CBA were executed, police and fire department members contributed 8 percent of their salaries to the city retirement fund and were afforded a 3 percent non-compounded COLA after they retired. Pursuant to the terms of each newly negotiated CBA, the parties agreed to modify both the COLA benefit for retirees and the employee contribution amount. Because these modifications occurred *before* the council exercised its authority to implement procedures to control the municipal pension system, the proposed changes required General Assembly approval. The parties recognized that this approval process could take time and could delay the CBAs' ratification. Thus, to expedite the process, both the 1989–91 police CBA and the 1990–92 fire CBA incorporated memoranda of agreement requiring that the General Assembly approve the proposed changes after the council ratified them.

During its 1990 session, the General Assembly enacted public laws approving the pension system changes included in the 1989–91 police CBA and 1990–92 fire CBA. In accordance with the provisions of P.L. 1990, ch. 212, § 1, and P.L.1990, ch. 469, § 1, respectively, uniformed members of the Providence Police and Fire Departments increased their contributions to the retirement fund over two years from 8 to 9.5 percent. In return, over the same two years, the city agreed to a two-part increase in retirees' COLA benefits, resulting in a 5 percent compounded COLA for

---

**3.** The city and the FOP also negotiated a CBA for the term of July 1, 1991, through June 30, 1992, which also was ratified by the council.

This CBA did not change or modify the COLA benefits or employee contributions negotiated under the 1989–91 police CBA.

firefighters retiring after July 1, 1991, and for police officers retiring after June 30, 1991. The city later adopted these changes in City of Providence Ordinance, ch.1991–5, Sections 9(17), 9(18)—the ordinance that codified the Providence Employees' Retirement System.

After a few years of relative calm, significant problems arose again in connection with the 1993–95 police CBA and the 1992–95 fire CBA. After the city successfully negotiated the terms of the aforementioned CBAs with the police and fire unions, both Mayor Vincent A. Cianci, Jr. (Mayor) and the respective police and fire union presidents signed the proposed agreements. This, however, did not complete the ratification process because, pursuant to § 17–27 of the City of Providence Code of Ordinances, the council also had to ratify the proposed CBAs. Unfortunately for plaintiffs, the council never was given the opportunity to do so because a number of events preceding the negotiation of the 1993–95 police CBA and the 1992–95 fire CBA resulted in the Mayor's decision not to submit them for ratification.

A power struggle between the Mayor and the council began in February 1992, when the Mayor submitted five contracts to the council for approval. Although the council consistently had approved proposed CBAs for municipal employees in the past, for the first time it rejected one of the five submitted CBAs. Further fueling the fire, in July 1992, the council passed Providence City Ordinance, No. 401 (Ordinance No. 401), limiting the mayor's power to enter into labor contracts lasting more than one year. In direct contravention of this ordinance, the Mayor entered into a three-year CBA with Local No. 1033 of the Laborers' International Union of America (Local No. 1033 CBA). To make matters worse, he then refused to submit the contract to the council for ratification.

In response, the council filed a declaratory judgment action in Superior Court seeking to compel the Mayor to comply with § 17–27, which was later reviewed by this Court in *Providence City Council v. Cianci*, 650 A.2d 499 (R.I.1994). The trial justice denied the council's request, finding: (1) that § 17–27 conflicted with G.L. 1956 § 28–9.4–5, which requires the city to bargain with the union in good faith; and (2) that the Local No. 1033 CBA was valid, binding, and enforceable. *Cianci*, 650 A.2d at 501. After judgment entered, the council filed a motion for reconsideration, arguing that Ordinance No. 401 rendered unenforceable the second and third years of the Local No. 1033 CBA. *Id.* The trial justice agreed and entered a modified order limiting the term of the Local No. 1033 CBA to one year. *Id.* Both parties appealed. *Id.* at 500.

This Court reversed the trial justice's decision in part, holding that the council had the authority under the charter to enact § 17–27 and that the Mayor's failure to submit the proposed Local No. 1033 CBA to the council for ratification rendered the CBA invalid and unenforceable. *Cianci*, 650 A.2d at 503.

Our decision in *Cianci* effectively rendered the 1993–95 police CBA and the 1992–95 fire CBA invalid and unenforceable. The council, well aware of this development, enacted City of Providence Ordinance, ch. 1995–17 (Ordinance 1995–17), only eight months after our decision in *Cianci*. The purpose of this ordinance, which triggered the present controversy, was to ease the burden on the city's retirement fund and prevent a significant tax increase by reducing the COLA benefit to current and former employees of the Providence Police and Fire Departments. The council made numerous findings, listed in Ordinance 1995–17, which purported to explain the decision to reduce the 5 percent

compounded COLA to a 3 percent simple COLA: (1) the decline in the growth of the pension fund since 1990 largely was caused by the implementation of the 5 percent compounded COLA; (2) although Class B employees[4] increased their contribution rate, the burden shouldered by the taxpayers to fund the city's contribution had soared from 24 percent in 1989 to a projected 46 percent in 1996; and (3) the city no longer could afford or justify the provision of a 5 percent compounded COLA, which was significantly higher than the consumer price index COLA calculation.

In a further attempt to reduce the strain on the retirement fund, the council passed City of Providence Ordinance, ch. 1996–4 (Ordinance 1996–4), which limited Class B employees' COLA benefits even further to a 3 percent non-compounded COLA applying only to the first $10,000 of their pension benefits.

The plaintiffs' cause of action arose when the city applied the COLA calculations contained in Ordinance 1995–17 and 1996–4 to police and fire department employees who retired before the effective dates of those ordinances. Pursuant to Ordinance 1996–4, effective January 1, 1996, plaintiffs received a $300 COLA payment at most (3 percent non-compounded on the first $10,000 of their pension benefits), after having received a 5 percent compounded COLA since their respective retirements.

On May 4, 2001, approximately five years after their COLA benefits were reduced, plaintiffs filed a complaint in Superior Court seeking declaratory judgments, injunctions, and monetary damages for their loss of benefits. After this date, the city ceased paying plaintiffs' COLA benefits entirely; in fact, since filing the instant lawsuit, plaintiffs have not received a COLA benefit as part of their pensions.

## B

### The Consent Decree Litigation

The instant complaint, however, was not the beginning of the long and tangled journey through the court system that the COLA benefit controversy has taken to date, reminiscent at times of the chancery case of Jarndyce and Jarndyce, described by Charles Dickens in the novel *Bleak House,* as it too "drones on."[5] On April 5, 1990, the city sought a declaratory judgment to determine the validity of the retirement board's previous approval of various COLAs for Class A and Class B city employees. *City of Providence v. The Employee Retirement Board of Providence,* 749 A.2d 1088, 1090 (R.I.2000) (*Mansolillo II*); *Mansolillo v. The Employee Retirement Board of Providence,* 668 A.2d 313, 314 (R.I.1995) (*Mansolillo I*). After a Superior Court justice ordered the parties to prepare and submit a written judgment denying the city's claims, counsel for both parties requested time to negotiate a final settlement of the case that would terminate the city pension controversy without further appeals. *Mansolillo II,* 749 A.2d at 1090; *Mansolillo I,* 668 A.2d at 314. The parties negotiated a consent judgment, which the retirement board adopted and the trial justice entered on December 18, 1991, awarding a 6 percent compounded COLA to the settlement's beneficiaries. *Picard v. City of Providence,* 1999 WL 814274, No. 98–40L, slip op. at 2 (D.R.I.1999); *Mansolillo II,* 749 A.2d at 1091. The city complied fully with the consent decree for roughly two years, in apparent reliance on this Court's holding in *Bruckshaw v. Paolino,* 557 A.2d

---

4. Employees of the Providence Fire and Police Departments are Class B employees.

5. Charles Dickens, *Bleak House* 4 (Everyman's Library 1991) (1853).

1221 (R.I.1989) (concerning the retirement board's authority pursuant to the Home Rule Charter), until 1993, when the council acknowledged our holding in *Betz*, 605 A.2d at 839 (holding that the charter served to vest in the council the exclusive authority to *legislate* city employee benefits while delegating to the retirement board only the authority to *regulate* those benefits), and sought a declaration that the consent decree was invalid. *Mansolillo II*, 749 A.2d at 1091–92.

By agreement of the parties, seven questions were certified to this Court and, in *Mansolillo I*, 668 A.2d at 316–17, we concluded that the consent judgment was valid, final, and binding upon the city as to the parties involved in the litigation, but declined to respond to the remaining six questions. The case returned to this Court in *Mansolillo II*, 749 A.2d at 1095, 1100, after the trial justice found that the six certified questions left unanswered by this Court were moot and that the consent decree applied only to those city employees, including a number of firefighters, who had retired on or before the date of entry of the consent decree, December 18, 1991. In addition to challenging the trial justice's findings, defendants also challenged the validity of City of Providence Ordinance, chs.1994–1 and 1994–2 (Ordinances 1994–1 and 1994–2), which attempted to vacate and nullify the consent judgment and establish a new benefits scheme for retirees. *Mansolillo II*, 749 at 1100. Neither ordinance included the 6 percent compounded COLA. Ordinance, ch.1994–1, § 1; Ordinance, ch.1994–2, § 2. This Court held that: (1) the consent decree was valid and binding on the city, but covered only those employees who had retired on or before December 18, 1991; and (2) that

Ordinances 1994–1 and 1994–2 were valid council enactments, but that they could not be applied to impair any pension benefit rights previously granted to those city employees who had retired effective on or before December 18, 1991. *Mansolillo II*, 749 A.2d at 1100. Because plaintiffs retired after this date, the consent decree litigation did not resolve the instant COLA controversy.

## C

### The Federal Court Litigation

In 1998, while the consent decree controversies were pending in state court, a number of retired police officers and firefighters, some but not all of whom are involved in the instant litigation, commenced suit in federal court. *Picard v. Members of the Employee Retirement Board of Providence*, 275 F.3d 139, 142 (1st Cir.2001). They alleged numerous constitutional violations stemming from (1) the council's decision to adopt Ordinance No.1994–1, which terminated the COLA provisions of the consent decree, and (2) the council's failure to provide plaintiffs with the COLA benefits included in the fire CBA in effect from 1992 through 1995 and the police CBA in effect from 1993 through 1995, neither of which was ratified by the council. *Picard*, 1999 WL 814274, No. 98–40L, slip op. at 5.

■ The District Court initially entered summary judgment against plaintiffs on their CBA-based claims only pursuant to this Court's decision in *Cianci*, but it declined to rule on the merits of the claims arising from the consent decree. *Picard*, 275 F.3d at 143. The District Court was concerned that, pursuant to the *Rooker–Feldman* doctrine,[6] it might not have juris-

---

**6.** The *Rooker–Feldman* doctrine prohibits federal district and circuit courts from directly reviewing the decisions of state courts. *See*

*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust*

diction because a state superior court already had found that the consent decree applied only to those employees who retired on or before December 18, 1991. *Id.* at 142–43. The District Court later granted defendants' motion to dismiss the remaining consent decree claims based on lack of standing, lack of subject matter jurisdiction, *res judicata,* and collateral estoppel.[7] *Id.* at 143. In December 2001, the Circuit Court affirmed the District Court's ruling and declined to exercise jurisdiction because the issue of whether the consent decree extended to police officers and firefighters who retired after January 1994 was squarely addressed when the parties were before this Court in *Mansolillo II;* therefore, the litigation constituted an improper attempt to seek federal review of a final state court judgment. *Picard,* 275 F.3d at 145.

In a last-ditch effort to resolve the COLA issue in federal court and reap the benefits of the consent decree, Local 799 of the IAFF (Local 799) filed a complaint in the United States District Court for the District of New Hampshire seeking declaratory relief against the city. *Local 799 of the International Association of Firefighters, AFL–CIO v. City of Providence,* No. 02–449–B, 2003 U.S. Dist. LEXIS 1536 (D.N.H. Jan. 31, 2003) (*Local 799* ). In this complaint, *Local 799* alleged that the city violated its members' rights under the United States Constitution's Contract Clause, U.S. Const. Art. I, § 10, cl. 1, when it adopted ordinances reducing the amount of the firefighters' COLA below the 5 percent compounded adjustment that had been bargained for and included in various CBAs, most importantly the 1990–92 fire CBA. *Local 799,* at *6. The federal

district court in New Hampshire ruled that, although Local 799 based its challenge primarily on the 1990–92 fire CBA—whereas the firefighter plaintiffs in *Picard* based their challenge on the consent decree and the 1992–95 fire CBA—both cases turned on the same set of operative facts, rendering Local 799's claims barred by the doctrine of claim preclusion. *Id.* at *8.

Interestingly, neither group of plaintiffs involved in the federal litigation argued that the retired firefighters' COLA benefits should be governed by the 1991 ordinance in place at the time of their retirement, Ordinance 1991–5. Instead, the firefighters waited until it was clear that they would not be covered by the consent decree—under which they would receive a 6 percent compounded COLA—to file the instant suit, which, if decided favorably, would award them a 5 percent compounded COLA as required by Ordinance 1991–5.

**D**

**The Parties**

A total of eighty-one plaintiffs are involved in the present appeal, and they can be divided into four separate groups. It is essential to separate plaintiffs into groups because not every plaintiff necessarily is involved in or affected by each issue raised in this appeal.

Group one includes the only two police officers remaining from the original police plaintiffs' complaint, both of whom retired between July 1, 1993, and June 30, 1995,

---

Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

**7.** By the time the District Court granted the motion to dismiss, this Court already had

decided *Mansolillo v. Employee Retirement Board of Providence,* 668 A.2d 313 (R.I.1995) (*Mansolillo I*) (holding that the consent decree was valid and binding on the city).

while a non-ratified CBA was in place.[8]

Alfred Mello is the only plaintiff comprising group two. Early in his career, Mello was a Providence Fire Department employee. He left his first position with the fire department after twenty-two years of service and began working as the director of communications, a civilian position included in the Class B pension system. Except for a brief break in service, he held his position until he retired in February 1992. When Mello retired, he was not covered by a ratified CBA.

Group three includes firefighters who retired between July 1, 1992, and June 30, 1993. The IAFF and the city agreed to enter into interest arbitration pursuant to the FFAA solely to resolve the COLA dispute for this contract year. The plaintiff retirees did not consent to the authority of the interest arbitration panel or to their representation by the IAFF. Nevertheless, the arbitration panel convened and, on April 4, 2005, rendered a decision—the Ryan Award—the applicability of which is at issue here.

Group four consists of firefighters who retired between July 1, 1993, and June 30, 1995, under non-ratified CBAs. Interest arbitration hearings have not commenced with regard to the 1993–94 and 1994–95 contract years. The members of groups three and four combined, total seventy-eight firefighters.

## II

### Analysis

#### A

##### Standard of Review

██ This case was tried upon a set of stipulated facts. The instant appeal pres-

ents us with the thorny task of resolving numerous legal issues of first impression: What body has jurisdiction to determine the status of plaintiff retirees' legal right to the disputed COLA benefit? What governs plaintiffs' COLA benefits when they retired under unenforceable contracts? To what extent, if any, can the council amend retired plaintiffs' COLA benefits by ordinance? We, like the trial justice, whose efforts we applaud, must work through these difficult questions by applying the law to the stipulated facts offered by the parties. Therefore, our review is *de novo*. *Richard v. Richard*, 900 A.2d 1170, 1174 (R.I.2006) (citing *1800 Smith St. Associates, LP v. Gencarelli*, 888 A.2d 46, 52 (R.I.2005) ("This Court reviews questions of law *de novo*.")).

#### B

##### Jurisdiction

The trial justice made two separate findings concerning the court's jurisdiction over plaintiffs' claims. First, at a hearing exclusively dealing with the court's subject-matter jurisdiction, the trial justice found that the Superior Court had jurisdiction to determine the appropriate amount of plaintiffs' COLA benefit. Despite this finding, approximately eight months after the Superior Court rendered its jurisdiction decision, an interest arbitration panel (panel) was convened at the request of the IAFF and the city pursuant to the provisions of the FFAA. The panel was charged only with determining the proper COLA benefit for the firefighters in Group 3 who retired during the first

8. Originally, the group of police plaintiffs included eighty retired police officers. The parties reached a settlement involving sixty-eight police officers. Ten other police officers were found to have retired under a ratified CBA, and judgment was entered in favor of these plaintiffs on May 27, 2004, leaving only two police plaintiffs involved in this appeal.

year of the non-ratified 1992–95 fire CBA.[9] After weighing the evidence the city and the IAFF presented, the panel rendered a decision on April 4, 2005, resolving the COLA controversy for firefighters who retired between July 1, 1992, and June 30, 1993. Although fully aware that the Superior Court previously had held it had subject-matter jurisdiction over the COLA controversy, defendants argued at the hearing in the Superior Court that the trial justice should defer to the arbitration panel's decision for resolving plaintiffs' claims. The trial justice instead held that the Superior Court had *exclusive* jurisdiction over plaintiffs' claims and explicitly rejected the arbitration panel's authority to determine benefits for already-retired firefighters without their consent.

■ The defendants' first argument on appeal is that the Superior Court was without subject-matter jurisdiction to determine plaintiffs' appropriate COLA benefits because the FFAA is the controlling statutory authority for determining unresolved collective-bargaining issues. Additionally, defendants argue that the trial justice erred in finding that the panel's decision had no bearing on the instant controversy. For the reasons that follow, we agree with the trial justice that, under the facts and circumstances of this case, the Superior Court had exclusive subject-matter jurisdiction over plaintiffs' claims and that the arbitration panel's award has no bearing on the determination of plaintiffs' COLA benefits.

■ The FFAA makes "available interest arbitration procedures to designated fire fighters * * * of any city or town." *Providence Lodge No. 3, FOP v. City of Providence*, 730 A.2d 17, 20 (R.I.1999). Interest arbitration panels have the au-

thority to determine conditions of employment, including the provisions of an employee pension plan. *Fraternal Order of Police, Westerly Lodge No. 10 v. Town of Westerly*, 659 A.2d 1104, 1105 (R.I.1995) (*Westerly Lodge No. 10*). Accordingly, the FFAA grants arbitration panels the power to render decisions amending current firefighters' pension plans. *Id.*

In the instant case, defendants suggest that an arbitration panel's authority may extend beyond the determination of pension benefits for current employees to include determination of the rights of former employees who already have retired. The defendants argue that *City of East Providence v. Local 850, International Association of Firefighters, AFL–CIO*, 117 R.I. 329, 366 A.2d 1151 (1976) (*Local 850*), and *Lime Rock Fire District v. Rhode Island State Labor Relations Board*, 673 A.2d 51 (R.I.1996) (*Lime Rock Fire District*), should guide our analysis of this jurisdictional issue. The defendants attempt to apply our holdings in *Local 850* and *Lime Rock Fire District* to the facts of this case to support their contention that the "statutory provisions of the FFAA provide the exclusive administrative remedy for firefighter unions to have unresolved issues in collective bargaining heard and to receive a binding decision regarding those issues."

In *Local 850*, this Court took an exacting look at the public policy underlying the FFAA's enactment and held that an arbitration panel under the FFAA has the authority to render a binding decision involving unresolved collective bargaining issues that the parties submit to arbitration, including those dealing with employee pensions. *Local 850*, 117 R.I. at 339, 366 A.2d at 1156. Twenty years later, in *Lime Rock Fire District*, we again analyzed the public policy underlying the FFAA's enact-

---

9. It should be noted that plaintiffs did not confer upon their former union the authority to represent them in the interest arbitration proceedings.

ment and held that a union subject to the FFAA must exhaust its statutory remedy—mandatory arbitration—before filing an unfair labor practices claim with the State Labor Relations Board (SLRB) because "the specific mechanism for resolving disputes under the FFAA is through arbitration." *Lime Rock Fire District,* 673 A.2d at 54.

In our opinion, this Court's holdings in *Local 850* and *Lime Rock Fire District* are inapposite when answering the jurisdictional question specifically presented here. We first note that defendants' argument is premised on inaccurate presumptions. Under the specific facts of this case, it is clear that plaintiffs are *not* unions, nor are they members of or represented by unions. In addition, plaintiffs are *not* currently engaged in collective bargaining. The plaintiffs in this case, unlike those in *Local 850* and *Lime Rock Fire District,* are retired firefighters seeking a declaration of their existing rights. Therefore, the FFAA does not apply to plaintiffs' claim.

We additionally find persuasive plaintiffs' argument that retirees, at least in situations such as the one now before us, cannot be treated as employees, as supported by the United States Supreme Court's sound reasoning in *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (*Allied Chemical*).[10] In *Allied Chemical,* the Court held that the term "employees" does not include retirees for the purposes of the National Labor Relations Act (act) for a number of reasons. *See id.* at 166, 92 S.Ct. 383. First, the ordinary meaning of the word "employee" does not include retired workers because

retirees have "ceased to work for another for hire." *Id.* at 168, 92 S.Ct. 383. Second, the act applies only to active workers because the act's purpose was not to prevent retirees from disrupting commerce, but instead was to create a mutual obligation for *active* workers and their employers to bargain collectively to avoid work disruptions. *Id.* at 163–64, 92 S.Ct. 383. Third, employees and retirees do not share a "community of interests," thereby creating a danger that active employees will bargain for better conditions at the expense of retirees' benefits. *Id.* at 173, 92 S.Ct. 383. All of these concerns are particularly significant in the present case.

The ordinary meaning of "firefighter" and the definition included in the FFAA cannot reasonably be construed to include retirees. The FFAA defines "firefighter" as "the permanent uniformed members, rescue service personnel of any city or town, emergency medical services personnel of any city or town, any fire dispatchers of any city or town, and all employees with the exception of fire chiefs of any paid fire department in any city or town within the state." Section 28–9.1–3(2). Retired firefighters, like plaintiffs, no longer are "permanent uniformed members" of the fire department.

Furthermore, the sound public policy underlying the FFAA's enactment does not apply to retirees in the same compelling way that it applies to current employees. The FFAA specifically states that it is

"the public policy of this state to accord to the permanent uniformed members, rescue service personnel of any city or town, emergency medical services personnel of any city or town, and all em-

**10.** This Court historically has looked to federal caselaw as a helpful guide, especially in the area of labor law, because of the similarities between federal and state regulations. *See,*

*e.g., Fraternal Order of Police, Westerly Lodge No. 10 v. Town of Westerly,* 659 A.2d 1104, 1105 (R.I.1995).

ployees of any paid fire department in any city or town all of the rights of labor other than the right to strike or engage in any work stoppage or slowdown. To provide for the exercise of these rights, a method of arbitration of disputes is established." Section 28–9.1–2(b). This policy is based on "a recognition of the necessity to provide some alternative mode of settling disputes where employees must, as a matter of public policy, be denied the usual right to strike." § 28–9.1–2(c). Under the facts of this case, there is absolutely no possibility that plaintiffs can or will strike or engage in a work stoppage or slowdown to pressure the city to comply with their COLA demands. Moreover, no plaintiff is a permanent uniformed member of the fire department who requires a method of arbitration to compensate him or her for the elimination of the right to strike. The dangers against which the FFAA protects are simply not present with regard to retirees.

Finally, because retirees and current employees of the fire department do not share a "community of interests" with respect to plaintiffs' COLA benefits—in fact, the interest arbitration advocated for here would have absolutely no effect on any current union member—the same danger that existed in *Allied Chemical* exists here; the IAFF and the city could conceivably come to an agreement that would adversely affect plaintiffs to benefit current fire department employees. Thus, we are persuaded that the term "firefighter" in the FFAA does not and cannot include retirees.

It should also be noted that defendants' argument that the trial justice erroneously relied on *Allied Chemical* in light of *Westerly Lodge No. 10*, is without merit be-

cause *Westerly Lodge No. 10* is factually distinguishable from the present case in a number of significant ways. The interest arbitration panel in *Westerly Lodge No. 10* was convened to decide unresolved collective-bargaining issues that affected current police officers. *Westerly Lodge No. 10*, 659 A.2d at 1105. The panel issued a pension escalator to be awarded to those employees retiring while the CBA was in effect and made it retroactive fifty-seven days so that police officers who had retired between the effective date of the new contract and the date of the decision would also receive the benefit. *Id.* By contrast, the only issue for an arbitration panel to decide in this case concerns already-retired firefighters' COLA benefits. Here, plaintiffs received pension benefits for a number of years before an issue arose over their COLA, distinguishing their situation from that of police officers whose union submitted a number of issues to arbitration *before* they had retired and were guaranteed the benefits negotiated during the arbitration, although the decision was issued *after* their official date of retirement. Accordingly, none of the dangers highlighted in *Allied Chemical* and discussed *supra* were implicated in *Westerly Lodge No. 10*.

After considering the specific facts of this case, we hold that plaintiff retirees *cannot* be subject to the FFAA's mandates. As such, we conclude that the Superior Court had exclusive jurisdiction to determine the appropriate amount of plaintiffs' COLA benefits and that the interest arbitration panel decision issued on April 4, 2005, has no bearing on the instant controversy.[11]

---

**11.** Nothing we hold today precludes retirees from engaging in permissive bargaining with or through their former union and employer.

## C

### The Terms of the Last Ratified Collective Bargaining Agreement

■ At the hearing on the merits, plaintiffs presented two possible sources for determining their proper COLA percentage: the terms of their last ratified CBAs or Ordinance 1991–5, both of which provide plaintiffs with a 5 percent compounded COLA upon retirement.

The plaintiffs advance two arguments in support of their contention that the terms of their last ratified CBAs should govern. First, plaintiffs draw our attention to the SLRB's decision in *Rhode Island State Labor Relations Board and Warwick School Committee,* No. ULP–4647 (RISLRB Nov. 10, 1992) (*Warwick School Committee*), and argue that this Court should conclude that the terms of an expired CBA control, pending successful negotiation of a new agreement. We disagree because such a determination is within the sole purview of the SLRB.

We do not deem the SLRB's decision in *Warwick School Committee* persuasive for a number of reasons. In *Warwick School Committee v. Warwick Teachers' Union, Local No. 915,* 613 A.2d 1273, 1274 (R.I. 1992) (*Warwick Teachers' Union*), a dispute arose between the City of Warwick and a union, which were actively engaged in contract negotiations. We held, in relevant part, that when a union contends that an expired agreement's terms should apply until a new agreement is reached, the appropriate remedy is to file an unfair labor practice complaint with the SLRB. *Warwick Teachers' Union,* 613 A.2d at 1276. Pursuant to our decision, the union filed a petition before the SLRB, which determined that the terms of the expired CBA were binding upon the parties until a subsequent agreement was reached. *Warwick School Committee,* ULP–4647 at 18.

■ While we agree that the SLRB's decision in *Warwick School Committee* provides some insight into how similar matters will be handled by the SLRB in the future, we do not agree that it provides grounds for this Court to stand in the place of the SLRB to make such a determination. Therefore, pursuant to G.L. 1956 § 28–9.3–4, we conclude that the SLRB, and not this Court, is the proper tribunal to decide whether the terms of an expired agreement are controlling when a dispute arises between the parties to a contract, pending the negotiation of a new agreement. *See Warwick Teachers' Union,* 613 A.2d at 1276.

The plaintiffs also contend that § 28–9.1–17 and G.L.1956 § 28–9.2–17, parallel provisions in the Municipal Police Arbitration Act (MPAA) and the FFAA, which latter enactments provide that:

> "[a]ll contractual provisions contained in a collective bargaining agreement entered into pursuant to the provisions of this chapter shall continue in the following collective bargaining agreement unless either the bargaining agent or the corporate authority shall, in writing, within the thirty (30) day period referred to in [§§ 28–9.1–17 and 28–9.2–17], propose a change in any contractual [provision or provisions]."

The plaintiffs claim that this language supports that the COLA provisions in effect in the last ratified CBAs continued in force at the time plaintiffs retired. We disagree.

It is undisputed that the 1993–95 police CBA and the 1992–95 fire CBA expired before plaintiffs' retirement dates, that no valid CBAs existed when plaintiffs retired, and that the terms of the next ratified fire and police CBAs were effectuated after plaintiffs retired. There is no authority that allows us to take the terms of an expired CBA and graft them onto a nonex-

istent CBA. Simply because uncontested terms would continue in the next CBA does not mean that they fill a gap between CBAs, especially when the gap covers a period of more than one year. Thus, §§ 28–9.1–17 and 28–9.2–17 do not establish that the COLA benefit provided in plaintiffs' last ratified CBAs continued at the time plaintiffs retired.

For the foregoing reasons, we conclude that the terms of plaintiffs' last ratified CBAs cannot be the source of plaintiffs' COLA benefits.

### D

### Reduction of Retirees' COLA Benefits by Ordinance *After* Their Date of Retirement

▮ By the conclusion of the hearing on the merits, both parties had agreed that Ordinance 1991–5 governed plaintiffs' COLA benefits at the time of their retirement. We agree. Ordinance 1991–5 was properly enacted and the 5 percent compounded COLA included therein continued in full force from 1992 to 1995, the period during which all plaintiffs retired under an unratified CBA. However, the parties differ in their characterization of the COLA benefit included therein; plaintiffs characterize it as a vested pension benefit that cannot be decreased by future ordinance, while defendants believe it is a gratuitous benefit, separate from the pension itself, susceptible to reduction by future ordinance. For the following reasons, we agree with plaintiffs and hold that they have a vested interest in the COLA provided in Ordinance 1991–5.

To determine whether plaintiffs have a vested right to receive the COLA provided in Ordinance 1991–5, we first scrutinize the nature of the COLA benefit itself. The purpose behind fire and police pension acts is to attract superior personnel to service

by "adequately compensating them for arduous and hazardous duties." 16A Eugene McQuillin, *The Law of Municipal Corporations* § 45.13.05 at 95–96 (3d rev. ed.2002). Jurisdictions called upon to define these pension benefits typically classify them as either contractual or gratuitous in nature.

Jurisdictions that classify pension benefits as contractual generally view them as part of the employment contract itself, providing deferred compensation for services rendered during the employment period. *See, e.g., Betts v. Board of Administration of the Public Employees' System,* 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614, 617 (1978); *Dorsey v. State ex rel. Mulrine,* 283 A.2d 834, 836 (Del.1971); *Board of Trustees of the Police Pension and Retirement System of Oklahoma City v. Weed,* 719 P.2d 1276, 1277 (Okla.1986); *Leonard v. City of Seattle,* 81 Wash.2d 479, 503 P.2d 741, 746 (1972). Purely contractual pension rights, such as employee contributions, vest immediately once the employment contract is signed and employment begins. *In re Almeida,* 611 A.2d 1375, 1385 (R.I.1992). Alternatively, benefits that are deemed deferred compensation vest when the employee completes his or her years of eligibility. *See Miller v. State,* 18 Cal.3d 808, 135 Cal.Rptr. 386, 557 P.2d 970, 973–74 (1977); *Wright v. Allegheny County Retirement Board,* 390 Pa. 75, 134 A.2d 231, 233 (1957).

Other jurisdictions view pension rights as merely gratuitous, "springing from the appreciation and graciousness of the state." *Haverstock v. State Public Employees Retirement Fund,* 490 N.E.2d 357, 361 (Ind.Ct.App.1986); *see also Keegan v. Board of Trustees of Illinois Municipal Retirement Fund,* 412 Ill. 430, 107 N.E.2d 702, 705 (1952); *City of Dallas v. Trammell,* 129 Tex. 150, 101 S.W.2d 1009, 1013 (1937). Thus, some courts have held that

reduction or elimination of such benefits can occur at will, leaving the employee without legal recourse. *See Haverstock*, 490 N.E.2d at 361.

■ This Court, in *In re Almeida*, 611 A.2d at 1386, chose to adopt a middle-ground position composed of elements of both the contractual and deferred compensation theories, holding that "[t]he right to deferred compensation vests upon meeting the terms of employment, but that vesting is subject to divestment because it is conditioned on continued honorable and faithful service." Therefore, in Rhode Island, pension benefits vest once an employee honorably and faithfully meets the applicable pension statute's requirements. Thus, to determine plaintiffs' pension rights and whether the COLA benefits included therein are vested or gratuitous, we must look to the applicable pension ordinance.

■ The parties agree that Ordinance 1991–5 was the controlling authority in effect at the time all plaintiffs retired. At that time, however, Ordinance 1991–5 lacked a specific classification of the COLA benefit, unlike its subsequent revisions that include the following language:

"All cost-of-living retirement adjustments granted to retirees under this section shall be considered *voluntary gratuities. The payment of such voluntary gratuities may be reduced or suspended by Ordinance at any time* upon a finding by the City Council that due to the existence of a depressed economy affecting the fiscal condition of the City it becomes expedient to reduce expenses in order to avoid or minimize a tax increase." City of Providence Ordinance, ch.1995–17 section 9 (Ordinance 1995–17) (emphases added); *see also* City of Providence Ordinance, ch. 1996–4 (Ordinance 1996–4).

We acknowledge that the city has broad discretion to prospectively change the pen-

sion benefit plan for firefighters and police officers *who have not yet retired* by enacting a new ordinance. Nevertheless, the issue confronting us is whether the council has authority to *retroactively* redefine a pension term. Consequently, because "[u]nder the guise of construction, the court will not rewrite the law, add to it what has been omitted, omit from it what has been inserted, or give it an effect beyond that gathered from the plain and direct import of the terms used," 16A McQuillin, § 45.13.05 at 102, we will not extend the definition provided in Ordinances 1995–17 and 1996–4 to Ordinance 1991–5. Rather, we look to Ordinance 1991–5 as a whole and its origins to determine the nature of the COLA benefit.

Section 9(13) of Ordinance 1991–5 states: "eligibility for a retirement allowance and the amount of such allowance shall be determined in accordance with the provisions of the ordinance to provide for the retirement of employees of the City of Providence *as in effect on the last day of a member's employment.*" (Emphasis added.) Section 9(2)(a)(c) defines Class B employees' retirement allowance as an annuity, which is the actuarial equivalent of their accumulated employee contribution at retirement plus a pension. Ordinance 1991–5 further defines a "pension" as "annual payments for life derived from appropriations provided by the City of Providence under the provisions of this ordinance." Section 1(13).

Ordinance 1991–5 also contains many of the provisions included in the 1923 Public Law, P.L.1923, ch. 489—the state retirement act in existence before the city created its own retirement system pursuant to its home rule charter. Section 17 of Ordinance 1991–5, which mirrors the language in the 1923 Public Law, provides Class B employees with a 3 percent non-compounded COLA due for the lifetime of the retir-

ee or beneficiary. Ordinance 1991–5 also includes separate COLA provisions that reflect the gradual COLA and employee contribution increases specifically for firefighters and police officers negotiated by plaintiffs' unions, which are applied in lieu of the COLA provided in Section 17. Sections 9(17) and (18).

■■■ Despite defendants' urging, we refuse to add language to Ordinance 1991–5 to classify it as a gratuitous benefit simply because such classifications were added to subsequent revisions of the pension ordinance. It is a municipality's duty to carefully craft an ordinance granting a pension benefit so that it is clear whether the benefit is gratuitous or vested and may not look to the courts to add language to an ordinance that the municipality omitted. *Goldman v. Forcier,* 68 R.I. 291, 297, 27 A.2d 340, 343 (1942). Looking solely at Ordinance 1991–5's terms, as we are required to do, we conclude quite the opposite; Ordinance 1991–5's terms and conditions clearly establish plaintiffs' vested interest in a lifetime 5 percent compounded COLA.

In addition to the plain language of Ordinance 1991–5, we are further persuaded that this is the correct interpretation because the COLA provisions in question were negotiated during the collective bargaining process [12] and because federal caselaw dealing with labor disputes supports such a conclusion. *See Westerly Lodge No. 10,* 659 A.2d at 1105 (recognizing " 'the persuasive force of federal cases in this field in view of the parallels between our system of labor regulations and the federal system' "). Both *Shaw v. International Association of Machinists and Aerospace Workers Pension Plan,* 750

F.2d 1458, 1466 (9th Cir.1985), and *Howell v. Anne Arundel County,* 14 F.Supp.2d 752, 754 (D.Md.1998), support the principle that a COLA is a vested pension benefit when a jurisdiction has adopted a mixed contract/deferred compensation theory of pension benefits. In *Shaw,* the United States Court of Appeals for the Ninth Circuit examined a retirement plan that set out a formula for computing a retiree's monthly retirement benefit. *Shaw,* 750 F.2d at 1460. The formula included a "living pension" feature that acted much like a COLA benefit in that it served to maintain the real value of an employee's pension in light of changes in the cost of living. *Id.* The Ninth Circuit was asked to determine whether the "living pension" was an accrued benefit or an ancillary benefit under the Employee Retirement Income Security Act of 1974 (ERISA). *Id.* After reviewing the pension plan as a whole and distinguishing the "living pension" from decidedly ancillary benefits such as medical coverage or early retirement, the court held that it was a "promised, anticipated and accrued" benefit, the reduction of which violated the plaintiffs' right to receive a vested benefit. *Id.* at 1466.

In *Howell,* five active police officers, one retired police officer, and their union sought injunctive and declaratory relief based on a county ordinance that amended the police retirement plan. *Howell,* 14 F.Supp.2d at 753. Most significantly, the ordinance changed the formula used to calculate the annual COLA payable under the plan, resulting in a reduction in the COLA benefit for retirees. *Id.* The court held that the purely prospective changes to the pension law exclusively applied to

---

**12.** Both the police and fire unions negotiated an increased COLA for their employees in exchange for an increased employee contribution to the pension fund. The CBAs containing these changes were ratified by the council and eventually were enacted by the General Assembly and included in Ordinance 1991–5.

current employees upon retirement were well within the county's authority. *Id.* at 754. However, the court dismissed the plaintiff retiree's claim for lack of standing because he was wholly unaffected by the change in the COLA formula. *Id.* This was because, upon retirement, his right to have his pension calculated with the original formula vested and could not be altered by future ordinance. *Id.* The plaintiffs' situation in the instant case is akin to that of the retired police officer in *Howell,* further supporting a conclusion that plaintiffs' interest in a 5 percent compounded COLA vested upon their retirement and cannot be altered by future ordinances.

We also agree with the trial justice that *Board of Trustees of the Sheet Metal Workers' National Pension Fund v. Commissioner of Internal Revenue,* 318 F.3d 599 (4th Cir.2003) (*Sheet Metal Workers*), supports the principle that a court must look to a retirement plan's provisions at the time an employee retires to ascertain whether he or she is entitled to a benefit. In *Sheet Metal Workers,* the United States Court of Appeals for the Fourth Circuit was faced with the task of interpreting ERISA's anti-cutback rule as it applied to the elimination of a COLA benefit granted to retirees *after* their date of retirement. *Id.* at 601. In determining that the COLA benefit was not a vested benefit for the plaintiffs, the court focused on the fact that the plaintiffs did not have reason to expect that their pension would provide a COLA during retirement because the terms of their retirement plan in effect at the time of their retirement did not include the disputed COLA benefit. *Id.* at 604.

The issue presented to the Fourth Circuit in *Sheet Metal Workers* is analogous to the COLA issue presented here. As in that case, the question before us is whether a COLA is a vested or gratuitous benefit for the specific retirees affected by a subsequent reduction in the benefit. The reasoning in *Sheet Metal Workers* persuades us to look to the terms of plaintiffs' pension plan *at the time they retired* to determine whether plaintiffs had reason to expect that their pension would provide the COLA they are seeking. *Sheet Metal Workers,* 318 F.3d at 604–05. It is indisputable that plaintiffs, through their unions, negotiated for a 5 percent compounded COLA, worked the requisite number of years to receive such a benefit, and expected to have that COLA calculated for the entirety of their pension. Thus, plaintiffs' expectation is distinguishable from that of the retirees in *Sheet Metal Workers* because, rather than receiving a gratuitous benefit after retirement, plaintiffs had a reasonable expectation at the time they retired that they would receive a 5 percent compounded COLA that would vest upon their retirement.

Accordingly, after analyzing the plain language of Ordinance 1991–5, the collective-bargaining origins of the 5 percent compounded COLA contained therein, and federal caselaw dealing with similar labor disputes, we hold that the council did not have the authority to reduce plaintiffs' COLA benefit by subsequent ordinance because their right to receive the COLA provided by Ordinance 1991–5, which constitutes a vital part of their retirement allowance, vested upon their retirement.

### E

### Remedy

 "The law ministers to the vigilant not to those who sleep on perceptible rights." *Puleio v. Vose,* 830 F.2d 1197, 1203 (1st Cir.1987). Although today we hold that the council exceeded its authority when it reduced plaintiffs' vested COLA benefits retroactively, we can fathom no satisfactory justification for plaintiffs' decision to sit on their rights for approximate-

ly five years before seeking a declaratory judgment. Consequently, we will not reward plaintiffs, nor will we punish defendants, for plaintiffs' delay in seeking a declaration of their rights.

Because we are convinced that the public interest is best served by doing so, we invoke our inherent power to "fashion an appropriate remedy that would serve the ends of justice" in this controversy and *sua sponte* rest our decision concerning plaintiffs' remedy on the equitable doctrine of laches.[13] *Blue Cross & Blue Shield of Rhode Island v. Najarian*, 911 A.2d 706, 711 n. 5 (R.I.2006) (quoting *Vincent v. Musone*, 574 A.2d 1234, 1235 (R.I.1990)). In general, a declaratory judgment proceeding is "sufficiently equitable in nature to justify the application of the doctrine of laches in appropriate circumstances." *Northern Trust Co. v. Zoning Board of Review of Westerly*, 899 A.2d 517, 520 n. 6 (R.I.2006) (mem.); *see also* 22A Am.Jur.2d *Declaratory Judgments* § 186 at 749 (2003) ("Since proceedings for declaratory relief have a great deal in common with equitable proceedings, the equitable doctrine of laches has been applied in such proceedings.").

Here, plaintiffs learned that their COLA benefits were going to be reduced by ordinance in 1995 and saw an actual reduction in 1996. However, plaintiffs waited until 2001 to commence their declaratory judgment proceeding in the Superior Court. Although some of the present plaintiffs, through several federal suits, hoped to take advantage of a favorable consent-decree ruling that would have provided them with a generous 6 percent compounded

COLA, no litigation ever sought to declare plaintiffs' COLA benefits pursuant to Ordinance 1991-5 or the terms of their last ratified CBAs.

In light of the plaintiffs' unnecessary delay, we direct the following: The plaintiffs shall receive a COLA benefit consistent with the terms of Ordinance 1991-5, reimbursed as of the date of the filing of this action *only*, without interest. The COLA benefit shall be calculated as follows: 5 percent compounded as of the plaintiffs' respective dates of retirement. The plaintiffs shall not be reimbursed for missed or reduced COLA payments between their respective dates of retirement and the filing of this action on May 4, 2001. Furthermore, the plaintiffs' reimbursement for the year 2001 should be prorated, excluding payments that would have been received between January and May. The plaintiffs' reimbursement for the period after they filed this action should reflect the increased value of their pensions had the 5 percent compounded COLA been properly calculated each year. Prospectively, the plaintiffs shall receive a 5 percent compounded COLA yearly under the terms of Ordinance 1991-5.

### Conclusion

It is time for this litigation to end. For the aforementioned reasons, we affirm the trial justice's decision in part and reverse in part and remand this case to the Superior Court to enter judgment for the plaintiffs consistent with this decision.

---

**13.** "[L]aches is unreasonable delay by the plaintiff in prosecuting a claim or protecting a right of which the plaintiff knew or should have known, and under circumstances causing prejudice to the defendant." 1 Dan B. Dobbs, *Law of Remedies*, § 2.4(4) at 103 (2d ed.1993). Given the egregious length of the delay in the instant case, "presuming prejudice to defendants gives us no pause." *Northern Trust Co. v. Zoning Board of Review of Westerly*, 899 A.2d 517, 520 (R.I.2006) (mem.).